No. 13-16918
(Consolidated with No. 13-16819,
13-16919, 13-16929, 13-16936, 13-17028, 13-17097)

**In the United States Court of Appeals
For the Ninth Circuit**

_____

**Angel Fraley**, et al.

*Plaintiffs-Appellees*

**C.M.D.**, et al.

*Intervenor-Plaintiffs-Appellees*

**John Schachter**, et al.

*Objectors-Appellants*

v.

**Facebook, Inc.**

*Defendant-Appellee*

_____

Appeal from the U.S. District Court
For the Northern District of California

BRIEF OF AMICI CURIAE CENTER FOR DIGITAL DEMOCRACY ET AL.,
IN SUPPORT OF SCHACHTER OBJECTORS-APPELLANTS AND REVERSAL

Hudson B. Kingston
Center for Digital Democracy
1621 Connecticut Ave., Ste 550
Washington, DC 20009
(202) 986-2220

*Counsel for Amicus Curiae*

## Corporate Disclosure Statement

Amici Center for Digital Democracy, Children Now, First Star, American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, Center for Global Policy Solutions, Center for Science in the Public Interest, Consumer Watchdog, Praxis Project, Public Health Advocacy Institute, Inc., and Media Alliance are nonprofit or charitable organizations with no issued stock and no parent corporations.

Pediatrics Now is an LLC with no parent corporations and no corporation owning more than 10 percent of its stock.

Media Literacy Project has a parent corporation, Albuquerque Academy, and no publicly held corporation owns more than 10 percent of Media Literacy Project's stock. Berkeley Media Studies Group is a project of the Public Health Institute, a nonprofit.  Yale Rudd Center for Food Policy and Obesity is a nonprofit within Yale University.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT …………………………………………i

TABLE OF CONTENTS ………………………………………………………ii

TABLE OF AUTHORITIES ……………………………………………………iii

STATEMENT OF AMICI INTEREST …………………………………………1

SUMMARY OF ARGUMENT AND INTRODUCTION ………………………6

ARGUMENT ……………………………………………………………………8

I. Privacy is a right common law has protected for over a century, evolving to protect privacy online ……………………………………8

II. Advertising practices on the internet accelerate and enlarge dangers of reputational harm by manipulating social networks for marketing purposes ………………………………………………………12

III. Reputational harm online is particularly pernicious for teens, who are not equipped to protect themselves ……………………...19

1. How teens use online social networks ……………………21

2. Marketers' targeting of teens ………………………………26

3. Risks to teens' long-term development …………………28

4. Teens' misunderstanding of privacy risks ………………32

5. Parents' necessary role …………………………………………36

CONCLUSION ………………………………………………………………38

CERTIFICATE OF COMPLIANCE …………………………………………39

CERTIFICATE OF SERVICE ………………………………………………40

# TABLE OF AUTHORITIES

## Cases

*Millar v. Taylor*,
  4 Burr. 2303, 2379 (K.B. 1769) ...........................................8–9

*Pavesich v. New England Life Insurance Co.*,
  50 S.E. 68, 72 (Ga. 1905) .......................................................10

*United States Dep't of Justice v. Reporters Comm. for Freedom of Press*,
  489 U.S. 749, 763 (1989) .......................................................14

## Statutes

Cal. Welf. & Inst Code §§ 300.2, 389 .............................................11

## Other authorities

Amanda Williams & Michael Merten, *A Review of Online Social
  Networking Profiles by Adolescents: Implications for Future
  Research and Intervention*,
  43 Adolescence 253 (2008) .................19–20, 22, 23, 24, 27, 32–33

Am. Acad. of Pediatrics, *Children, Adolescents, and Advertising*, 118
  Pediatrics 2563 (2006) ..........................................................26

Anita Allen, *The Natural Law Origins of the American Right To Privacy
  Tort*, 81 Fordham L. Rev. 1187 (2012) ..................................9, 10

Arnaud De Bruyn & Gary Lilien, *A Multi-Stage Model of Word-of-
  Mouth Influence through Viral Marketing*, 25 Int'l J. of Research
  in Mtkg. 151 (2008) ....................................................16–17, 27

*Brands Leverage Influencers' Reach on Blogs, Social*, eMarketer, Feb.
  27, 2013, http://www.emarketer.com/Article/Brands-Leverage-
  Influencers-Reach-on-Blogs-Social/1009695 .................................17

Caitlin Seida, *My Embarrassing Picture Went Viral*, Salon.com, Oct. 2, 2013, *available at* http://www.salon.com/2013/10/02/my_embarrassing_picture_went_viral/ ..........................................................................12–13

Center for Digital Democracy, Facebook's Misleading Data and Marketing Policies and Practices (2013), *available at* http://www.centerfordigitaldemocracy.org/sites/default/files/FTCFacebookDataPracticesFinal1013.pdf ......................................18

Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. Pub. Pol'y & Mktg. 202 (2005) *available at* https://webfiles.uci.edu/llevine/Levine%20articles%20in%20pdf/Pechmann-JPPM%20Fall%2005.pdf ..........................21, 25, 28, 31

Daniel Solove, The Future of Reputation (2007) ...............................13

Emily Bazelon, *Facebook Loosens Privacy Rules for Teenagers So That Facebook Can Make More Money*, Slate.com, Oct. 17, 2013, http://www.slate.com/blogs/xx_factor/2013/10/17/facebook_loosens_privacy_rules_for_teenagers_now_kids_posts_can_become_advertisements.html ..............................................................................35

Evan Selinger & Woodrow Hartzog, *Why Is Facebook Putting Teens at Risk?*, Bloomberg, Oct. 24, 2013, http://www.bloomberg.com/news/2013-10-24/why-is-facebook-putting-teens-at-risk-.html ..........................................................34

Deborah Moscardelli & Richard Divine, *Adolescents' Concern for Privacy When Using the Internet: An Empirical Analysis of Predictors and Relationships With Privacy-Protecting Behaviors*, 35 Family and Consumer Sciences Research J. 232 (2007) ............................................................33, 33–34, 35, 37

Facebook, Statement of Rights and Responsibilities, Nov. 15, 2013, https://www.facebook.com/terms.php ......................................15

iv

Federal Trade Commission, Protecting Consumer Privacy in an Era of
Rapid Change (2012) ................................................20, 28–29

Gwenn O'Keeffe, *Clinical Report—The Impact of Social Media on Children, Adolescents, and Families*,
127 Pediatrics 800 (2011) ....................................24, 25, 29, 37

Hayley Tsukayama, *FTC Evaluating Facebook Policy Changes*, Wash.
Post,                      Sept.                     12,                      2013,
http://www.washingtonpost.com/business/technology/ftc-
evaluating-facebook-policychanges/2013/09/11/da1db8ba-1b3f-
11e3-8685-5021e0c41964_story.html ....................................15

Jay Giedd, *The Teen Brain: Insights from Neuroimaging*, 42 J.
Adolescent Health 335 (2008) ........................................23, 31

Johan Ugander et al., The Anatomy of Facebook Social Graph (Working
Paper No. arXiv:1111.4503, Nov. 18, 2011) *available at*
http://arxiv.org/pdf/1111.4503v1.pdf ............................18–19, 19

Kathryn Montgomery & Jeffrey Chester, *Interactive Food and Beverage Marketing: Targeting Adolescents in the Digital Age*, 45 J. of
Adolescent Health S18 (2009), *available at*
http://digitalads.org/documents/
PIIS1054139X09001499.pdf ........................22, 24, 26, 26–27, 27

Laurence Steinberg, *Risk Taking in Adolescence: New Perspectives from Brain and Behavioral Science*, 16 Current Directions in
Psychological Sci. 55 (2007) ............................20–21, 23, 31, 37

Lior Strahilevitz, *A Social Networks Theory of Privacy* (John M. Olin
Law & Economics Working Paper No. 230, 2004) ...........13–14, 14

Mary Janisch, *KEEP OUT! Teen Strategies for Maintaining Privacy on Social Networks*, 1 Four Peaks Rev. 49, 51 (2011) .....15, 22, 23, 26

Microsoft Advertising, Influencing the Influencers 2 (2011),
http://advertising.microsoft.com/WWDocs/User/en-

us/ForAdvertisers/Social-Media-Word-of-Mouth-White-Paper-Microsoft-Advertising-August-2011.pdf ................................18

Natasha Singer, *They Loved Your G.P.A. Then They Saw Your Tweets*, N.Y. Times, Nov. 10, 2013, at BU3 .............................29, 29–30

National Conference of State Legislatures, Privacy Protections in State Constitutions, http://www.ncsl.org/research/telecommunications-and-information-technology/privacy-protections-in-state-constitutions.aspx ...............................................................11

Okan Akcay, *Marketing to Teenagers: The influence of Color, Ethnicity and Gender*, 3 Int'l J. Bus. & Soc. Sci. 10, 10 (2012) .........................26, 27, 28

Pew Internet Project, Teens, Social Media, and Privacy 8 (May 21, 2013), *available at* http://www.pewinternet.org/~/media//Files/Reports/2013/PIP_TeensSocialMediaandPrivacy_PDF.pdf ….............21–22, 26, 32, 33, 36

Samuel Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) ...................................................8, 8–9, 9, 10–11, 11

Seounmi Youn, *Determinants of Online Privacy Concern and Its Influence on Privacy Protection Behaviors Among Young Adolescents*, 43 J. Consumer Affairs 389, 408 (2009) ......32, 33–34

Seounmi Youn, *Parental Influence and Teens' Attitude Toward Online Privacy Protection*, Red Orbit, Oct. 2, 2008, http://www.redorbit.com/news/technology/1575192/ ............36, 37

Somini Sengupta, *Warily, Schools Watch Students on the Internet*, N.Y. Times, Oct. 29, 2013, at A1 ...................................................30

Somini Sengupta, *When Sites Drag the Unwitting Across the Web*, N.Y. Times, Nov. 13, 2011, at B1 .............................................22–23

Sonia Livingstone, *Taking Risky Opportunities in Youthful Content Creation: Teenagers' Use of Social Networking Sites for Intimacy, Privacy and Self-Expression*,
LSE Research Online 10 (2008), *available at* http://eprints.lse.ac.uk/27072/ ......15–16, 21, 23–24, 24, 24–25, 25

Stephanie Armour, *Borrowers Hit Social-Media Hurdles*, Wall St. J., Jan. 8, 2014, *available at* http://online.wsj.com/news/articles/SB10001424052702304773104 579266423512930050 ........................................................29

White House, Consumer Data Privacy in a Networked World (Feb. 2012) ..............................................................................20

Wildfire Social Media Marketing, 5 Best Practices for Increasing Earned Media: Proven Facebook Campaign Types that Triple Sharing and Participation http://www.slideshare.net/dingli8888/wildfire-report-maximize-earned-media-with-social ....................................................16

William Prosser, *Privacy*, 48 Calif. L. Rev. 383 (1960) ......................11

Word of Mouth Marketing Association, Home, http://www.womma.org/ ......................................................17

Word of Mouth Marketing Association, Influencer Guidebook 2013, *available at* http://www.womma.org/influencers ......................17

Word of Mouth Marketing Association, Member Listing, http://www.womma.org/membership/member-listing ...............17

Youtube.com, Coca-Cola Content 2020 Part One, https://www.youtube.com/watch?v=LerdMmWjU_E .................16

## Rules

F.R.A.P. 29(c)(5) ..............................................................................1

vii

## STATEMENT OF AMICI INTEREST[1]

The Center for Digital Democracy (CDD) is recognized as a leading national consumer protection and privacy organization.  CDD's public education programs are focused on informing consumers, policy makers, and the press about contemporary digital marketing and data collection issues, including their impact on public health, children and youth, and financial services.

Media Alliance (MA) was formed in 1976 by a group of media workers to unite the professional media and public interest communities. MA advocates for democratic communications and protects alternative and community media outlets.  MA was founded with the belief that in order to maintain a truly democratic society, media must be accessible, accountable, decentralized, representative of society's diversity and free from covert or overt government control and corporate dominance.

Media Literacy Project was founded in 1993. Through education, programs, and grassroots campaigns, its mission is to transform

---

[1] Pursuant to F.R.A.P. 29(c)(5), amici state that this brief was not authored in whole or in part by any party's counsel, and only the Center for Digital Democracy has contributed any funds for the preparation or submission of this brief.

everyday people into critical media consumers and engaged advocates who deconstruct media, inform media policy, and create media that reflects their lived experience.

Berkeley Media Studies Group (BMSG) is a nonprofit organization dedicated to expanding advocates' ability to improve the systems that determine health. It helps advocates harness lessons from research and develop the skills they need to shape coverage of health issues, illuminating the need for health-supporting policies. BMSG also partners with organizations and individuals to build the capacity of advocates, public health professionals, and community decision-makers.

Center for Global Policy Solutions is a social change nonprofit dedicated to making policy work for people and their environments by advancing innovative and effective solutions to our world's most critical challenges.

Public Health Advocacy Institute, Inc., (PHAI) is a non-profit, public interest organization at Northeastern University School of Law dedicated to protecting the health of the public since 1979. PHAI is committed to research in public health law, policy development, legal technical assistance, and collaborative work at the intersection of law

and public health. PHAI recently published research focusing on digital marketing practices that compromise youth privacy.

The Yale Rudd Center for Food Policy and Obesity is a non-profit research and public policy organization devoted to improving the world's diet, preventing obesity, and reducing weight stigma. Rudd Center serves as a leader in building broad-based consensus to change diet and activity patterns, while holding industry and government agencies responsible for safeguarding public health.

The Praxis Project is a national Health Justice intermediary whose mission is to build healthy communities by changing the power relationships between people of color and the institutional structures that affect their lives.

The Center for Science in the Public Interest (CSPI) is the health-advocacy group that publishes *Nutrition Action Healthletter*. CSPI mounts educational programs and presses for changes in government and corporate policies. CSPI's interest in this case is two-fold: protecting advertising recipients from content promoting junk food, and protecting the privacy of minors who interacted with an unhealthy food product company on social media without intending to endorse it.

3

Consumer Watchdog (CW) is a national nonprofit, nonpartisan consumer advocacy organization. Founded in 1985, CW seeks to hold corporations accountable in the legislature and the courts. One of CW's chief focuses is privacy rights, and it has focused substantial attention on the issue of online privacy. CW, and the public on whose behalf it advocates, is vitally interested in ensuring that minors are protected from corporations that misappropriate personal information online.

Founded in 1930, the American Academy of Pediatrics (AAP) is a national, not-for-profit organization dedicated to furthering the interests of children's health. Since AAP's inception, its membership has grown from 60 pediatricians to over 60,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists. AAP works with the federal, state and local governments, health care providers, and parents on behalf of America's children.

Pediatrics Now, LLC, is one of today's leading multimedia voices in child, teen and digital health—providing timely reliable information for parents, journalists and healthcare providers. Pediatrics Now's platforms include its website, consulting services, and community and professional speaking services.

4

The mission of the American Academy of Child and Adolescent Psychiatry is to promote the healthy development of children, adolescents, and families through research, training, prevention, comprehensive diagnosis, and treatment.

First Star improves the lives of America's abused and neglected children by strengthening their rights, illuminating systemic failures and igniting necessary reforms. Founded in 1999, it is a leading national advocate for children's rights and pursues its mission through research, public engagement, policy advocacy, education, and litigation.

Children Now is the only research, policy, and advocacy organization providing umbrella representation covering education and health issues for children in California. It builds effective, broad-based coalitions to do "what's best for kids," and seeks to leverage the power of the media to improve children's health and protect kids from unhealthy media practices.

Amici write separately to address the strong policy reasons for shielding teens from exploitation of their particular vulnerabilities.

## SUMMARY OF ARGUMENT AND INTRODUCTION

Amici curiae write in support of the Schachter objectors-appellants and their arguments against the settlement approved by the District Court. The settlement, and the accompanying changed Facebook terms of service, treats teenagers as adults and allows every interaction with Facebook to be used by Facebook for third-party marketers in commercial messages. This is a problematic outcome for teens and goes against state laws designed to protect this vulnerable group.

The individual right to privacy has been recognized in American law for a century and is protected through a backbone of state common law. Privacy in one's communications with friends and confidants is necessary for individual self-determination. Nowadays the internet promotes personal growth through intimate communication yet threatens privacy with unwanted appropriation and third-party publication of private facts. By making information permanent and infinitely shareable, the internet has the potential to severely and comprehensively damage a person's reputation when information "goes viral," spreading beyond its intended audience. Such harm is lasting and can hinder teens' overall development.

6

Teens are a lucrative market segment for digital advertisers, who use sophisticated techniques to target them. Adolescents' user data is harvested from social media sites like Facebook, a storehouse of material for viral marketing. Unchecked commercial use of teen user data violates teens' privacy, and can undercut their ability to successfully step into adulthood. Nearly a third of college admissions offices are searching applicants' social media posts and making admissions decisions based on that information. Moreover, teens are punished for online content by their schools, bullied online, and harassed by strangers online—problems made worse by publication of private information to wide audiences.

State law provides necessary protections for adolescents as they navigate a phase rife with impulsive actions, risk taking, and emotional vulnerability—all of which are immortalized on their Facebook profiles. Under these laws teens cannot waive their rights without parents' consent. Due to the possibility that information, some of it false, about teenagers will spread and harm their development and participation in society, it is especially important that courts be allowed to protect teens from the appropriation of their likenesses. The settlement of a case

7

brought for violations of teens' privacy should not remove states' privacy protections of minors.

Argument

### I.    Privacy is a right common law has protected for over a century, evolving to protect privacy online

The laws infringed by this settlement reflect states' careful balance between privacy and expressive rights.

The idea of unified protection of privacy through common law arises from an article by Samuel Warren and Louis Brandeis "The Right to Privacy," published in 1890. 4 Harv. L. Rev. 193. This "right to be let alone" reflected the societal belief that there should be a "remedy for the unauthorized circulation of portraits of private persons" in new media. *Id.* at 195. The authors' analysis helped states build a coherent body of privacy law on an existing historic right. *Id.* at 193; *see generally id.* (citing cases from previous centuries showing privacy rights vindicated through tort and quasi-contract law).

Warren and Brandeis argued that protecting privacy was necessary considering the damage that overexposure can do to a person's mental and emotional wellbeing. *Id.* at 196. Even if a person has shared views with friends, that person still has a claim to privacy in those views. "It is

8

certain every man has a right to keep his own sentiments, if he pleases. He has certainly a right to judge whether he will make them public, or commit them only to the sight of his friends." *Id.* at 198 n.2 (quoting *Millar v. Taylor*, 4 Burr. 2303, 2379 (K.B. 1769)). Regardless of the commercial merit of a statement, "[n]o other has the right to publish his productions in any form, without his consent." *Id.* at 199.

Further, the right to privacy pertains regardless of what "modern device" is used to reproduce people's "casual and often involuntary" expressive acts. *Id.* at 206–07. Of paramount importance was protecting "the acts and sayings of a man in his social and domestic relations [from] ruthless publicity." *Id.* at 214. This protection from publicity in new media is a concept that still resonates today.

In 1905 the first court opinion explicitly endorsing a privacy tort set the stage for future law. *See* Anita Allen, *The Natural Law Origins of the American Right To Privacy Tort*, 81 Fordham L. Rev. 1187, 1187 (2012). In *Pavesich v. New England Life Insurance Co.* a man's photograph was appropriated for a commercial without his consent, and the Georgia Supreme Court found this a serious affront to liberty and self-determination. *Id.* at 1187, 1199. The court understood privacy as an

individual right that "may be waived for one purpose, and still asserted for another; it may be waived in behalf of one class, and retained as against another class; it may be waived as to one individual, and retained as against all other persons." *Pavesich*, 50 S.E. 68, 72 (Ga. 1905). This right sometimes cannot be waived, and "some matters of private concern are not to be made public, even with the consent of those interested." *Id.* at 73. The laws at issue today make teens' privacy non-waivable by default.

Broad acceptance followed this case and led to the adoption of privacy torts across the country. Allen, *supra*, at 1193; *id.* at 1201 (55 years later there were at least 300 state law cases recognizing rights to privacy). The *Pavesich* court foretold:

> So thoroughly satisfied are we that the law recognizes, within proper limits, as a legal right, the right of privacy, and that the publication of one's picture without his consent by another as an advertisement, for the mere purpose of increasing the profits and gains of the advertiser, is an invasion of this right, that we venture to predict that the day will come that the American bar will marvel that a contrary view was ever entertained by judges of eminence and ability . . .

*Pavesich*, 50 S.E. at 80–81.

"It is the unwarranted invasion of individual privacy which is reprehended, and to be, so far as possible, prevented." Warren &

Brandeis, *supra*, at 215. Warren and Brandeis called for legislation to protect society's interest in the individual's right to be left alone. *Id.* at 219–20. When courts were reluctant to find the right at common law, state legislatures acted to protect it. *See*, *e.g.*, William Prosser, *Privacy*, 48 Calif. L. Rev. 383, 385 (1960) (recounting when a New York court rejected the common law right "a storm of public disapproval" lead to criminal and civil statutes for commercial appropriation).

States lead the way in protecting privacy across American society,[2] including particular protections for minors,[3] under traditional common law and codification. The seven states that explicitly protect minors from appropriation of their images without parental consent have looked at

---

[2] Almost every state has recognized the privacy torts. Additionally, ten states have constitutional privacy rights. National Conference of State Legislatures, Privacy Protections in State Constitutions, http://www.ncsl.org/research/telecommunications-and-information-technology/privacy-protections-in-state-constitutions.aspx (last visited Jan. 22, 2014). By contrast, federal law protects privacy rights within certain contexts, such as health records or student data.

[3] For example, states protect the identities of minors involved in criminal trials as well as allow sealing of minors' criminal convictions after they reach majority. *See*, *e.g.*, Cal. Welf. & Inst Code §§ 300.2 ("the provisions of this chapter ensuring the confidentiality of proceedings and records are intended to protect the privacy rights of the child"), 389 (giving procedure for application to seal minor criminal records).

potential harms to minors and crafted appropriate civil or criminal protections. Hence, instead of treating adolescents as adults—as the settlement and new Facebook terms purport to do—these states have effectively made teen privacy rights non-waivable by those that hold it, overcome only in particular situations with the consent of parents. This legal balance laudably accounts for teens' vulnerabilities, discussed below, and is a fundamental part of protecting teens' development into young adults.

## II.    Advertising practices on the internet accelerate and enlarge dangers of reputational harm by manipulating social networks for marketing purposes

In the modern age privacy violations can result in reputational harm online. Normal social anonymity by obscurity (i.e. getting lost in the crowd) is not possible when information can be stored indefinitely, searched easily, and spread at the speed of fiberoptic communications.

People have been subjected to ridicule and subsequent privacy invasions after they voluntarily posted content online, and even when their information was posted against their will. *See* Caitlin Seida, *My Embarrassing Picture Went Viral*, Salon.com, Oct. 2, 2013, *available at* http://www.salon.com/2013/10/02/my_embarrassing_picture_went_viral/

(recounting countless disparaging comments on, and the impossibility of ever erasing, a Halloween costume photo that spread around the internet); Daniel Solove, The Future of Reputation 42–48 (2007) (describing three teenagers whose images and home video, posted both intentionally and by other parties, became international news and created permanent notoriety through reposts and satirical, sometimes insulting, copycat photos and videos). Once their information was reposted it could not be deleted by the original owner, and its further spread could not be prevented. This experience is psychologically damaging, especially for younger people. *See*, *e.g.*, Solove, *supra*, at 47 (according to the New York Times a teenager known to many as "Star Wars Kid" transferred high schools, dropped out of school, and had to seek psychiatric care following his unwanted fame and subsequent fallout with peers). Each of these people's images "went viral" and spread far beyond the customary audience that such information might reach.

Today's gossip moves much more quickly than it did in the media of a century ago. "In a nation where reality television and blogging are all the rage, it is impossible to find a type of personal fact that no one has shared with thousands of strangers." Lior Strahilevitz, *A Social*

*Networks Theory of Privacy* 10 (John M. Olin Law & Economics Working Paper No. 230, 2004). This is why courts respect the individual's intent to publish information, rather than categorically deeming certain facts as public or private. *Id.*

Social networks theory[4] shows how privacy can be harmed when information disclosed to a small group reaches highly communicative people and "goes viral." *See generally id.* Most people reveal their deepest secrets to a handful of people. *Id.* at 2. The Supreme Court recognizes such disclosed facts are often still private. *Id.* at 5 n.6 (citing *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)). In any social network there are those who transmit information between groups; these "hubs" are instrumental in transmitting information through social networks. *Id.* at 27. Information that does not reach hubs will normally degrade over time through a network—less relevant information is not passed along. *Id.* at 44. For that reason, most people reasonably expect privacy beyond two degrees of separation. *Id.* at 47.

---

[4] While online "social networks" such as Facebook provide one example of social networks theory, the term more broadly refers to theories that describe how people interact both online and offline.

14

The internet and online marketing warp this reality.[5] Unlike social networks in offline society, online social networks strengthen ties by giving access to someone's personal information to any "friend." Mary Janisch, *KEEP OUT! Teen Strategies for Maintaining Privacy on Social Networks*, 1 Four Peaks Rev. 49, 51 (2011). Privacy is directly implicated by the content of online social networks because "social networking sites typically display as standard precisely the personal information that previous generations have often regarded as private." Sonia Livingstone, *Taking Risky Opportunities in Youthful Content Creation: Teenagers' Use of Social Networking Sites for Intimacy, Privacy and Self-*

---

[5] Facebook's terms of service currently allow the company to publish all of a teen's profile information, without specific consent to any individual advertisement. Facebook, Statement of Rights and Responsibilities, Nov. 15, 2013, https://www.facebook.com/terms.php (asserting all users permit Facebook "to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content"). In 2012 the Federal Trade Commission (FTC) entered into a 20-year consent decree with Facebook for past privacy violations; and under the decree FTC recently investigated Facebook's changed terms. *See* Hayley Tsukayama, *FTC Evaluating Facebook Policy Changes*, Wash. Post, Sept. 12, 2013, http://www.washingtonpost.com/business/technology/ftc-evaluating-facebook-policychanges/2013/09/11/da1db8ba-1b3f-11e3-8685-5021e0c41964_story.html.

15

*Expression*, LSE Research Online 10 (2008), *available at* http://eprints.lse.ac.uk/27072/.

While people's embarrassing moments going viral might be a violation of privacy to them, it can be highly profitable for others. Online marketers encourage their followers in social media to provide content that can then be turned into viral marketing materials. Lucrative user-generated content, "earned" from fan loyalty, is presented to other online users as endorsements. *See*, e.g.*,* Youtube.com, Coca-Cola Content 2020 Part One, https://www.youtube.com/watch?v=LerdMmWjU_E (last visited Jan. 17, 2014) (discussing using this tactic to "provok[e] conversations" and viral content about Coca-Cola); Wildfire Social Media Marketing, 5 Best Practices for Increasing Earned Media: Proven Facebook Campaign Types that Triple Sharing and Participation http://www.slideshare.net/dingli8888/wildfire-report-maximize-earned-media-with-social (Google advertising firm guidance on increasing earned marketing and sales on Facebook). On platforms like Facebook companies pay to promote an individual's actions in relation to their brand, hoping that user content will spread to the person's network of friends and beyond. "Friends" are more profitable for viral marketing

16

than colleagues or professional acquaintances. Arnaud De Bruyn & Gary Lilien, *A Multi-Stage Model of Word-of-Mouth Influence through Viral Marketing*, 25 Int'l J. of Research in Mtkg. 151, 161 (2008).

The Word of Mouth Marketing Association (WOMMA) is a trade association for social media marketing, representing 243 corporate members such as McDonald's, Google, and Unilever. WOMMA, Home, http://www.womma.org/; WOMMA, Member Listing, http://www.womma.org/membership/member-listing (both last visited Jan. 21, 2014). WOMMA explains targeting certain people: "[I]t is rarely practical for brands to focus on reaching everyone. . . . there is an interest in engaging those individuals who have disproportionate influence in the marketplace." WOMMA, Influencer Guidebook 2013 5, *available at* http://www.womma.org/influencers.[6] WOMMA categorizes people based on their "influencer" (a.k.a. "hub") potential and type in order to decide whether to target them. *Id.* at 7. This is just one example, and nearly two-thirds of big American brands pay for influencer-based advertising. *Brands Leverage Influencers' Reach on Blogs, Social*, eMarketer, Feb. 27, 2013, http://www.emarketer.com/Article/Brands-Leverage-Influencers-

---

[6] Report can be requested at this website, original on file with author.

Reach-on-Blogs-Social/1009695; *see*, *e.g.*, Microsoft Advertising, Influencing the Influencers 2 (2011), http://advertising.microsoft.com/WWDocs/User/en-us/ForAdvertisers/Social-Media-Word-of-Mouth-White-Paper-Microsoft-Advertising-August-2011.pdf (emphasizing the importance of strategic social media word of mouth marketing).

Facebook partners with cutting-edge companies who tap user information to make advertising content that will spread as far as possible with the help of influencer targeting. *See generally* Center for Digital Democracy, Facebook's Misleading Data and Marketing Policies and Practices (2013) (outlining the complex web of marketers and data companies Facebook partners with to sell user data as advertisements), *available* *at* http://www.centerfordigitaldemocracy.org/sites/default/files/FTCFacebookDataPracticesFinal1013.pdf. The fodder for this information is anything a teen has posted or done on Facebook, and the potential advertisement audience is huge.

Because Facebook's staff has a bird's eye view of every user's network, it can go further in modeling human interactions than other

researchers. *See* Johan Ugander et al., The Anatomy of Facebook Social Graph 2 (Working Paper No. arXiv:1111.4503, Nov. 18, 2011) (describing this study as "the largest social network ever analyzed"), *available at* http://arxiv.org/pdf/1111.4503v1.pdf. Rather than "six degrees of separation," Facebook can connect any American user to any other American user with just over four, on average. *Id.* at 5. At only two degrees a person with 100 "friends" has an average "27,500 unique friends-of-friends and 40,300 non-unique friends-of-friends." *Id.* at 8. With this in mind, and without any extra effort by a user, "[s]hared content only needs to advance a few steps across Facebook's social network to reach a substantial fraction of the world's population." *Id.* at 13. Facebook's sway over this situation for advertisers can put teens at great risk of exposure—its research shows, "individuals on Facebook have potentially tremendous reach." *Id.*

### III.   Reputational harm online is particularly pernicious for teens, who are not equipped to protect themselves

"Identity formation is a primary task in adolescence . . . and young people who actively explore their identities are more likely to experience mood swings, self-doubt, confusion, disturbed thinking, impulsivity, conflict with parents, reduced ego strength, and increased physical

19

symptoms." Amanda Williams & Michael Merten, *A Review of Online Social Networking Profiles by Adolescents: Implications for Future Research and Intervention*, 43 Adolescence 253, 256–57 (2008) (citations omitted). Our society uses law to protect minors from military service, alcohol and tobacco consumption, and leaving school prematurely. Laws restrict minors to provisional drivers' permits and withhold the right to vote until adulthood. This is a key time in individuals' lives and society protects them, mostly through state law, from full adult accountability. Protecting teen privacy is part of this commitment.

Both the Federal Trade Commission (FTC) and the White House have recognized that teenagers' lack of sophistication and understanding of online business practices should be met with higher consumer protections. FTC, Protecting Consumer Privacy in an Era of Rapid Change 29, 60 (2012) [hereinafter FTC Privacy]; White House, Consumer Data Privacy in a Networked World 15, 17, 48 (Feb. 2012). Adolescents are dealing with a unique developmental period that includes risky behavior. Laurence Steinberg, *Risk Taking in Adolescence: New Perspectives from Brain and Behavioral Science*, 16 Current Directions in Psychological Sci. 55, 55 (2007) (surveying neurological studies on

20

adolescent risk taking). This period is characterized by high impulsivity and self-consciousness, which leads to emotional fragility. *See* Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. Pub. Pol'y & Mktg. 202 (2005) (surveying neuroscience, psychology, and marketing studies to gauge adolescents' unique vulnerabilities), *available at* https://webfiles.uci.edu/llevine/Levine%20articles%20in%20pdf/Pechma nn-JPPM%20Fall%2005.pdf. Due to adolescents' distinctive characteristics it is fitting that seven states take their privacy seriously enough to prohibit appropriation of their likenesses without parents' consent.

### 1. How teens use online social networks

Teenagers flock to the online medium because it is "their" space and a forum in which they can engage in risky behaviors in their peer group. Livingstone, *supra*, at 4; *id.* ("what, for an adult observer, may seem risky is, for a teenager, often precisely the opportunity they seek"). Teenagers perceive Facebook as an extension of their real life social network rather than a commercial space. Pew Internet Project, Teens, Social Media, and Privacy 8 (May 21, 2013) (explaining how teens "curate" their pages to

garner the most likes from their friends and remove content that is not as popular), *available at* http://www.pewinternet.org/~/media//Files/Reports/2013/PIP_TeensSocialMediaandPrivacy_PDF.pdf. However, online information has a much higher potential of lingering beyond a teen's formative years and spreading beyond the teen's peer group.

Teens use social networking websites differently than adults, and these differences produce inaccurate information not intended for large audiences. Adolescents are using the internet to interact and create content and stories to share with others. Kathryn Montgomery & Jeff Chester, *Interactive Food and Beverage Marketing: Targeting Adolescents in the Digital Age*, 45 J. of Adolescent Health S18, S18 (2009), *available at* http://digitalads.org/documents/PIIS1054139X09001499.pdf. "Well over half of all online teens are creating content for the Web." *Id.* at S23 (citing studies); *accord* Williams & Merten, *supra*, at 253. Nearly a third of teens said they were linked to friends online who they had never met in person. Janisch, *supra*, at 51. Friends can repost teens' information for a different audience, sometimes without audience restrictions or by mistake. Somini

Sengupta, *When Sites Drag the Unwitting Across the Web*, N.Y. Times, Nov. 13, 2011, at B1 (recounting how a privacy-conscious teen's personal information spread beyond Facebook to another platform, Klout, because the teen interacted with his mother's Facebook profile—she was surprised to discover later that her profile settings exposed her children online).

While adults focus on what they could lose by online interactions, adolescents focus on what they can gain, because their brains put more emphasis on rewards. Janisch, *supra*, at 52; Steinberg, *supra*, at 57 ("adolescents may be more sensitive than adults to variation in rewards but comparably sensitive (or even less sensitive) to variation in costs"); Jay Giedd, *The Teen Brain: Insights from Neuroimaging*, 42 J. Adolescent Health 335, 340 (2008) (presenting fMRI findings that reward and motivation portions of the brain change at onset of puberty). This does not lead to responsible information dissemination. In a study of adolescent's social media posts open to the general public, 84 percent of profiles included references to risk taking behaviors such as alcohol or illegal drug consumption. Williams & Merten, *supra*, at 264. Teens' popularity on a network is more important to them than the sharing of

23

particular personal information. Livingstone, *supra*, at 7. Untrue or hyperbolic information such as false location, age, family relationships, and pregnancy are bandied about by teens as jokes for their friends, while to an outside observer they appear to be deeply personal information. *Id.*; *see also* Williams & Merten, *supra*, at 257 ("sexual content and adult language [are] high in the ranks of what teens talk about online").

This is in keeping with findings that teens are impulsive and are highly susceptible to peer pressure. Montgomery & Chester, *supra*, at S24; *accord* Gwenn O'Keeffe, *Clinical Report—The Impact of Social Media on Children, Adolescents, and Families*, 127 Pediatrics 800, 800 (2011). Moreover "[a]s adolescents explore their identity, they will go through behavioral patterns that on the surface may appear to be cause for concern, but are actually developmentally appropriate and healthy." Williams & Merten, *supra*, at 257. Nevertheless this data feeds into Facebook and could be saved long-term by marketers and Facebook commercial partners, associated with teens into adulthood, and used in marketing campaigns.

Designing an online profile is about peers' preferences rather than individual choice. Peer group norms, rather than pure self-expression,

mold teen online social networking. Livingstone, *supra*, at 7; *accord* Pechmann et al., *supra*, at 209. This makes sense in terms of adolescent brain development because "vulnerability to peer pressure increases between preadolescense and mid-adolescence [and] peaks in mid-adolescence . . . gradually declin[ing] thereafter." Stenberg, *supra*, at 57; *see also* O'Keeffe, *supra*, at 800 (noting susceptibility to peer pressure as a factor of adolescent social media use). Teens give friends access to their passwords and permission to change their accounts. Livingstone, *supra*, at 7. To the extent that a teen associates with a brand due to peer pressure or a friend's login, a company might use that information as a product endorsement though the owner of the account has no genuine interest.

In order to create and sustain intimacy teens share personal information with one another on online social networks, but such sharing does not indicate a lack of privacy concern. *Id.* at 10. Teens have a hard time managing "gradations of intimacy" among online audiences because the simple designation "friend" often does not reflect the finer distinctions of their social experience. *Id.* at 11. To regain this nuance, rather than using privacy settings, teens "provide fake information, use

25

aliases instead of real names, temporarily deactivate their accounts, or write in an ambiguous way so that only their intended audience can understand." Janisch, *supra*, at 50; *see* Pew Internet Project, *supra*, at 9 (finding more than a quarter of teens post false information to protect their privacy). These tactics do little to prevent unwanted republication of false or inappropriate statements in sponsored material.

### 2. Marketers' targeting of teens

Online marketers are aware of social network theory and seek to exploit teens in order to spread information that is otherwise likely to be forgotten. "For years, companies have purposefully sought out the most influential young 'connectors' within their social groups and encouraged them to promote brands among their friends." Montgomery & Chester, *supra*, at S21; *see* Am. Acad. of Pediatrics, *Children, Adolescents, and Advertising*, 118 Pediatrics 2563, 2563 (2006) (noting marketers increasingly target the young to create brand preference); Okan Akcay, *Marketing to Teenagers: The influence of Color, Ethnicity and Gender*, 3 Int'l J. Bus. & Soc. Sci. 10, 10 (2012) (discussing the importance of targeting teens, especially Hispanics, as a growing population segment with large purchasing power). Credulous teens are the subject of intense

26

industry study and focus. Montgomery & Chester, *supra*, at S21 (citing industry research on viral peer-to-peer marketing); *see*, *e.g.*, Akcay, *supra*. Marketers use peer-to-peer marketing to make the banal into viral content, spreading it as far as possible. *See*, *e.g.*, De Bruyn & Lilien, *supra*, at 151("The goal of viral marketing is to use consumer-to-consumer . . . communications . . . leading to more rapid and cost effective adoption by the market." (citation omitted)).

Adolescents are the subject and objects of viral marketing. Teens are "primary targets for digital marketing" due to their facility with new media and purchasing power. Montgomery & Chester, *supra*, at S18; *accord* Akcay, *supra*, at 10–11. Adolescents' online profiles "contain intimate, candid, and observable self-disclosure and peer interaction that can be analyzed creating an overall picture of adolescent behavior." Williams & Merten, *supra*, at 254; *id.* at 272 ("Social networking sites are . . . mines of adolescent data. The information is out there and is rich in substance and meaning . . ." (citation and quote marks omitted)). This trove of content could be branded and sold, without any special notice to teens, under Facebook's current terms.

27

Promoted information about teenage users does not degrade in Facebook, and when someone's action is deemed profitable by a Facebook marketing algorithm the user's likeness will spread to entire networks regardless of relevance. With the promotion of individual facts by advertising dollars, information about users will make it to hubs, who can then share the information across many social groups. Marketers are aware that teens show increased affiliation with brands, which can be converted into "endorsements" in advertisements. *See* Pechmann et al., *supra*, at 210 ("adolescents rely on brands to project a positive image to others and to bolster feelings of self-worth."); Akcay, *supra*, at 11 ("Most teens consider themselves to be brand loyal and have an emotional connection with products."). A reputation-harming post promoted to friends-of-friends (a common audience selection for Facebook posts) can be seen by tens of thousands and cannot be retracted. As will be addressed below, this use does not match teen intent and could harm them at a key developmental stage.

### 3. Risks to teens' long-term development

FTC is clear about the possible risks to teenagers: "Teens tend to be more impulsive than adults and, as a result, may voluntarily disclose

28

more information online than they should, leaving them vulnerable to identity theft or adversely affecting potential employment or college admissions opportunities." FTC Privacy, *supra*, at 70 (citing agency findings and academic studies on teens' privacy attitudes); *accord* O'Keeffe, *supra*, at 802. These are vulnerabilities that also could result in unexpected financial repercussions later in life. *See* Stephanie Armour, *Borrowers Hit Social-Media Hurdles*, Wall St. J., Jan. 8, 2014, *available* *at* http://online.wsj.com/news/articles/SB100014240527023047731045792 6423512930050. "More lending companies are mining Facebook . . . and other social-media data to help determine a borrower's creditworthiness or identity, a trend that is raising concerns among consumer groups and regulators." *Id.*

According to a survey of 381 institutions, nearly a third of college admissions personnel check applicants' social media presence in determining college entrance. Natasha Singer, *They Loved Your G.P.A. Then They Saw Your Tweets*, N.Y. Times, Nov. 10, 2013, at BU3. The Kaplan Test Prep study showed "online scrutiny of college hopefuls is growing." *Id.* This follows the already widespread use of similar searches

by prospective employers. *Id.* Additionally, some school districts are employing automated monitoring services to track students' online posts outside of school hours. Somini Sengupta, *Warily, Schools Watch Students on the Internet*, N.Y. Times, Oct. 29, 2013, at A1. Without knowing if such monitoring is legal, schools are going through with it and punishing students for their online acts. *Id.*

For example, teens have been disciplined by their school for posting compromising photos taken at a slumber party to Facebook. *Id.* While in that Indiana case the punishment was retracted, *id.*, it highlights the fact that teens can be held accountable for photos or descriptions of private situations that other teens post, and might be refused college admission or employment for school records tarnished by others' Facebook content. Moreover, as high-tech school surveillance and marketing promotion both increase, these instances will multiply and teens will suffer more setbacks for questionable content that others upload about them.

Schools are looking to prevent behavior like online bullying that sometimes gets so severe that it leads to suicide and arrests. *Id.* As can be seen from the examples of reputational harm in Section II, *supra*, notoriety online can force students to leave school and withdraw from the

30

world, sometimes experiencing severe depression. This is not a surprise to the experts, self-doubt and an inability to cope with abstract thought combine with emotional turmoil to increase adolescents' emotional vulnerabilities. Pechmann et al., *supra*, at 208–10; Steinberg, *supra*, at 56 (explaining adolescent brains have "a socioemotional network that is especially sensitive to social and emotional stimuli . . . . [but] a cognitive-control network . . that matures gradually over the course of adolescence and young adulthood" which leads to a lack of self-control in the face of peer pressure or strong emotions); Giedd, *supra*, at 340 (discussing neuroscience findings that emotion and reward networks mature for teens well before self-control "executive" functions). Society seeks to minimize this psychological danger with legal protections.

When a teen's online activities and image are promoted to wide audiences, damaging online exposure can result in hurtful comments and actions by strangers. Consequences can be worse for teens due to their vulnerability and their misunderstanding of the risks to their online privacy.

31

### 4. Teens' misunderstanding of privacy risks

Overall, most teens do not perceive threats to privacy from internet companies, and tactics to protect themselves from known parties leaves them open to third-party appropriation. Only 9 percent of teenagers are very concerned about third-party access and use of their data, and most teens are highly confident that they are managing their privacy settings adequately. Pew Internet Project, *supra*, at 2, 10; *see also* Seounmi Youn, *Determinants of Online Privacy Concern and Its Influence on Privacy Protection Behaviors Among Young Adolescents*, 43 J. Consumer Affairs 389, 408 (2009) [hereinafter Youn 2009] ("Among young adolescents, confidence in their ability to protect their personal information from e-marketers may be so strong and widespread that they have little concern about the negative consequences [of] information disclosure."). Teenage users believe that Facebook does not use their information commercially and that privacy settings on the service protect them from third-party access. Pew Internet Project, *supra*, at 10 (elaborating "Insights from our focus groups suggest that some teens may not have a good sense of whether the information they share on a social media site is being used by third parties."); *see also* Williams & Merten, *supra*, at 269 ("one cannot

assume users—specifically adolescents—thoroughly review hosting sites' terms of use"). At the same time, teens are increasingly posting personal information to social media sites such as Facebook. Pew Internet Project, *supra*, at 3–4 (tracking the increase in personal information sharing by teens between 2006 and 2012).

As privacy concerns rise, the most common self-protective action teens take is providing false information. Deborah Moscardelli & Richard Divine, *Adolescents' Concern for Privacy When Using the Internet: An Empirical Analysis of Predictors and Relationships With Privacy-Protecting Behaviors*, 35 Family and Consumer Sciences Research J. 232, 246 (2007). Such actions may protect against known first-party readers, but it becomes problematic information when accepted as genuine and inserted into third-party promoted content.

Unfortunately, "the perception of anonymity and safety experienced by youth while using the Internet is a false one. . . . [and] research also suggests that teens may lack a sufficient concern about the consequences of disclosing their private information." *Id.* at 234; *accord* Youn 2009, *supra*, at 408. Adolescents' frequent use of the internet and limited consumer skills make them particularly vulnerable to invasions

of privacy due to failure to protect themselves properly. Moscardelli & Divine, *supra*, at 233.

Facebook's privacy settings put overly confident teens at risk, especially now that their information can be shared directly with the entire Facebook community. Experts in technology and ethics responded forcefully against Facebooks' rollback of teen protections: "Now that Facebook . . . has changed its policy, teens have access to a broader, more public audience" and that information will be analyzed and searched through new "Graph Search" features. Evan Selinger & Woodrow Hartzog, *Why Is Facebook Putting Teens at Risk?*, Bloomberg, Oct. 24, 2013, http://www.bloomberg.com/news/2013-10-24/why-is-facebook-putting-teens-at-risk-.html (reacting to a policy change allowing teens to post publicly, to the whole Facebook community). "Searchability can become a serious hazard if it reveals the controversial or embarrassing views, relationships and experiences many of us had as teenagers." *Id.* Increased openness of posting and improved searching and analysis of teens' past posts will make it possible for long-lost content to resurface to the detriment of individuals. *Id.*

An author who has written extensively on teen issues and bullying explained this disconnect: "[T]his isn't about what kids want. It's about what Facebook wants, which is to make more money. . . . If kids can share publicly, then their posts, or things they 'like,' can also turn into the advertising fodder that the company is banking on for profits." Emily Bazelon, *Facebook Loosens Privacy Rules for Teenagers So That Facebook Can Make More Money*, Slate.com, Oct. 17, 2013, http://www.slate.com/blogs/xx_factor/2013/10/17/facebook_loosens_privacy_rules_for_teenagers_now_kids_posts_can_become_advertisements.html. Facebook's founder Marc Zuckerberg said the company wants to habituate users to sharing information broadly, to serve the company's advertising goals. *Id.* Unwise posts will follow teens for the rest of their lives, permanently associated with their legal names and easily searched and retrieved. *Id.*

Concern over privacy is something that teens learn from parents, peers, and overall experience with the internet. Moscardelli & Divine, *supra*, at 243. However, even when teens increase their concern they do not choose the most effective ways to protect themselves. *Id.* at 244 (explaining teens who are concerned with privacy provide false

information or attack unwanted advertisers with abusive messages). They are more likely than adults to resort to less ethical means, falsification and abusive language, to protect their privacy. *Id.* at 246. Consequently, heightened privacy concerns in teens can actually serve to increase the reputation-harming content a teen posts online, which might spread through commercial promotion.

### 5. Parents' necessary role

In stark contrast to teens, 81 percent of parents are "very" or "somewhat" concerned with teens' personal information going to advertisers. Pew Internet Project, *supra*, at 10 (46 percent were "very concerned"). The vast majority of parents think that the sharing of teens' personal information should be mediated by parental consent, and scientific study has shown that parental guidance is central to teens learning about privacy in the digital age. *See* Seounmi Youn, *Parental Influence and Teens' Attitude Toward Online Privacy Protection*, Red Orbit, Oct. 2, 2008, http://www.redorbit.com/news/technology/1575192/ [hereinafter Youn 2008] (citing studies and explaining parental supervision is necessary to improve teen understanding of online privacy).

36

Unlike other commercial targeting, parents have limited control over online marketing practices. Moscardelli & Divine, *supra*, at 235. The legal concepts and protections around privacy in the United States are based on empowering individuals to self-protect, which, in the case of teens might not function properly due to underestimation of risk. Youn 2008, *supra*. Consequently, involving parents in teens' use and understanding of the internet will help teens to navigate privacy issues online. *Id.*; *accord* Moscardelli & Divine, *supra*, at 238; *accord* O'Keeffe, *supra*, at 802; *cf.* Steinberg, *supra*, at 58 (asserting that risky teen behavior is "to some extent, inevitable," and that since wisdom takes time to develop "focus[ing] on limiting opportunities for immature judgment to have harmful consequences" is more important than education). The seven state statutes protecting teens from appropriation involve parents in their children's privacy and address this issue.

In order to give teens the agency they expect from the internet, social networks must allow them to express themselves without using this expression unexpectedly in marketers' materials. This reflects teenage capacity and would align with the state laws at issue in the Schachter appellants' objection. Considering teens' expectations, parents'

role in protecting their children, and the high risks of reputational and emotional harm, states' protections of minors against appropriation must be upheld.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the brief of the Schachter objectors-appellants, amici curiae respectfully request that this Court vacate the settlement approved below. The risk to teens is too great and state laws protecting teens must be allowed to function as intended, especially in relation to new media which presents significant danger to unwary adolescents.

February 20, 2014                    Respectfully Submitted,

                                     By: s/ Hudson Kingston
                                     Hudson B. Kingston
                                     Center for Digital Democracy
                                     1621 Connecticut Ave., Ste 550
                                     Washington, DC 20009
                                     (202) 986-2220
                                     hudson@democraticmedia.org

                                     *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c) and Ninth Circuit Rule 32-1, the attached amicus brief is proportionally spaced with a typeface of 14 point, Century font, and contains 6964 words, excluding parts exempted by Rule 32(a)(7)(B)(iii), according to Microsoft Word 2013 word count.

February 20, 2014                    Respectfully Submitted,

                                     By: s/ Hudson Kingston
                                     Hudson B. Kingston
                                     Center for Digital Democracy
                                     1621 Connecticut Ave., Ste 550
                                     Washington, DC 20009
                                     (202) 986-2220
                                     hudson@democraticmedia.org

                                     *Counsel for Amicus Curiae*

CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

February 20, 2014                    Respectfully Submitted,

                                     By: s/ Hudson Kingston
                                     Hudson B. Kingston
                                     Center for Digital Democracy
                                     1621 Connecticut Ave., Ste 550
                                     Washington, DC 20009
                                     (202) 986-2220
                                     hudson@democraticmedia.org

                                     *Counsel for Amicus Curiae*