**Case No. 13-16918**
(Consolidated with Nos. 13-16819, -16919, -16929, -16936, -17028 & -17097)

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANGEL **FRALEY**, et al.,

*Plaintiffs-Appellees*,

**C.M.D.**, et al.,

*Intervenor-Plaintiffs-Appellees*,

JOHN **SCHACTER** (on behalf of himself and his minor son S.M.S.),
KIM PARSONS (on behalf of herself and her minor daughter C.B.P.),
ANN LEONARD (on behalf of herself and her minor daughter D.Z.),
R.P. (through her mother Margaret Becker), and J.C. (through his
father Michael Carome), Class Members,

*Objector-Appellants*,

v.

**FACEBOOK, INC.**,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
(Hon. Judge Richard Seeborg, United States District Judge)

BRIEF OF *AMICUS CURIAE* ELECTRONIC PRIVACY
INFORMATION CENTER (EPIC) IN SUPPORT OF APPELLANTS

Marc Rotenberg
   *Counsel of Record*
Alan Butler[*]
Julia Horwitz[**]
Electronic Privacy Information Center
1718 Connecticut Ave. NW,
Suite 200
Washington, DC 20009
(202) 483-1140

February 20, 2014

---

[*] Mr. Butler is admitted to practice in the State of California and the District of Columbia.
[**] Ms. Horwitz is admitted to practice in the State of Maryland and the District of Columbia.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(c), *Amicus Curiae* Electronic Privacy Information Center ("EPIC") is a District of Columbia corporation with no parent corporation. No publicly held company owns 10% or more of EPIC stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT....................................................iii

TABLE OF CONTENTS ................................................................................. iv

TABLE OF AUTHORITIES ........................................................................... vi

INTEREST OF AMICUS ................................................................................ 1

SUMMARY OF THE ARGUMENT ................................................................ 2

ARGUMENT.................................................................................................... 2

    I.   The Tort of Misappropriation Is the Cornerstone of Modern Privacy Law.......................................................................................................... 2

        A. In 1903 the State of New York Established the First Modern Privacy Law Following the Misuse of a Minor's Image for Commercial Purposes ........... 3

        B. Social Network Services Seek to Extract Commercial Value from Minor Users Without Meaningful Consent ............................................................... 6

        C. Remarkably, the Proposed Settlement Would Allow Defendant Facebook to Routinely Violate Multiple State Privacy Laws......................................... 7

    II.  The Authorization of Unlawful Conduct is Just One of Several Indicators That the Settlement Is Flawed ................................................ 8

        A. The Settlement Fails to Comply with Requirements Arising From a Prior Order Against Defendant Facebook Set Out by the Federal Trade Commission ..................................................................................................... 9

        B. The Settlement Fails to Comply With Federal Trade Commission's Recently Updated Advertising Guidelines ................................................... 11

        C. The Settlement Adopts the Fiction of "Deemed Consent" to Allow the Use of a Minor's Image Without Actual Consent ....................................... 13

        D. The Settlement Would Establish No Meaningful New Safeguards for Facebook Users .......................................................................................... 15

        E. The Settlement Fails to Allocate *Cy Pres* Funds to Consumer Privacy Organizations Aligned with the Interests of Class Members ...................... 18

    III. Chief Justice Roberts Expressed Wide-ranging Concerns About a Similar Settlement Arising in a Similar Consumer Privacy Case This Term Against Defendant Facebook ....................................................... 20

A. Many of the "Fundamental Concerns" That Chief Justice Roberts Identified in the *Lane* Settlement Are Present in the *Fraley* Settlement ...... 21

B. The Ninth Circuit Has Previously Expressed Concern About the Selection of *Cy Pres* Beneficiaries Not Aligned with the Interests of Silent Class Members ................................................................................................. 25

**IV. Amici EPIC and Others Have Actively Sought to Improve the Settlement Terms But Still Conclude That the Final Settlement is Fatally Flawed and Must Be Rejected ................................................... 26**

**CONCLUSION .................................................................................. 30**

**CERTIFICATE OF COMPLIANCE ................................................ 31**

**CERTIFICATE OF SERVICE ......................................................... 32**

# TABLE OF AUTHORITIES

## CASES

*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013) ..................................................... 6, 7

*Dennis v. Kellogg Co.*, No. 11-55674, 2012 WL 2870128 (9th Cir. 2012)...... 18, 25

*In re Google Buzz Privacy Litigation*, No. 10-672, 2011 WL 7460099
    (N.D. Cal. Mar. 31, 2011) ................................................................................. 28

*In re Google Buzz Privacy Litigation*, No. 10-672, 2011 WL 7460099
    (N.D. Cal. entered Mar. 31, 2011) ................................................................ 19, 20

*Marek v. Lane*, 134 S. Ct. 8 (2013) ................................................................ 20, 21

*Marek v. Lane*, 703 F.3d 791, 793-94 (9th Cir. 2013)...................................... 25, 26

*Mirfasihi v. Fleet Mortgage,* No. 01-722, 2007 WL 2066503
    (N.D. Ill. July 17, 2007) ................................................................................. 20

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011)......................................... 18

*Roberson v. Rochester Folding Box Co.*, *171 N.Y. 538,* 64 N.E. 442
    (N.Y. 1902) .................................................................................................. 3, 4

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301
    (9th Cir. 1990) ............................................................................................ 18, 25

## STATUTES

1903 N.Y. Laws ch. 132, §§ 1-2......................................................................... 4

Ala. Code § 8-27-3 ......................................................................................... 5

Alaska Stat. Ann. § 45.50.910 (West) ............................................................ 5

Cal. Civ. Code § 3344(a) .............................................................................. 5, 8

Fla. Stat. Ann. § 540.08(1), (6) .................................................................... 5, 8

N.C. Gen. Stat. Ann. § 66-152 (West);............................................................ 5

N.Y. Civ. Rights Law § 50 ........................................................................... 5, 8

Ohio Rev. Code Ann. § 1333.61 (West).............................................................. 5

Okla. Stat. Ann. tit. 21, § 839.1 ................................................................... 5, 8

Or. Rev. Stat. Ann. § 646.465 (West)................................................................ 5

Tenn. Code Ann. § 47-25-1105(a)................................................................... 5, 8

VA Code Ann. § 59.1-336............................................................................... 5

Va. Code Ann. § 8.01-40(A) ......................................................................... 5, 8

Wis. Stat. Ann. § 995.50(2)(b) ..................................................................... 5, 8

## OTHER AUTHORITIES

Barbara Ortutay, *Facebook faces opposition to privacy settlement*, Associated Press (Feb. 14, 2014) ........................................................................ 17

Cecilia Kang, *Parents Resume Privacy Fight vs. Facebook Over Use of Children's Images in Ads*, Wash. Post (Feb. 13, 2014) ...................................... 17

danah boyd, *It's Complicated: the Social Lives of Networked Teens*, Yale University Press (2014) ...................................................................... 6, 11

EPIC, Comments to the Federal Trade Commision, In re Facebook, Inc., FTC File No. 092 3184 (Dec. 27, 2011) ............................................. 22

*EPIC, Privacy Groups File Objection to Proposed Google Buzz Settlement* (Apr. 1, 2011) ............................................................................... 19

Erin Egan, *Proposed Statement to our Governing Documents*, Facebook (Aug. 29, 2013) ............................................................................ 10

Facebook, *Data Use Policy* (2013) ............................................................. 10

Fed. Trade Comm'n, *Dot Com Disclosures* (2013) ................................... 12

Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change* 60 (2012) ................................................................................ 14

Guidelines Concerning the Use of Endorsements and Testimonials, 16 C.F.R. § 255 (2009) .......................................................... 11, 12, 13

Jessica Guynn, *Facebook Social Ads Settlement Under Fire from Children's Advocates*, L.A. Times (Feb. 13, 2014) .................................... 17

Julie Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 Stan. L. Rev. 1373 (2000) ................................................... 7

Karen Gullo, *Facebook Advertising Settlement Challenged by Consumer Group*, Businessweek (Feb. 13, 2014) ............................................... 17

Letter from Campaign for a Commercial-Free Childhood to the United States Court of Appeals for the Ninth Circuit (Feb. 12, 2014) ............ 15, 16

Letter from David Vladeck, Director, Fed. Trade Comm'n, Bureau of Consumer Protection, to Marc Rotenberg, Director, EPIC (Jan. 14, 2010) ........ 22

Letter from Donald S. Clark, Secretary, Fed. Trade Comm'n, to Marc Rotenberg et. al (July 27, 2012) ............................................... 22

Letter from EPIC et al. to the Honorable Lucy H. Koh (Jul. 11, 2012) ........... 26, 28

Letter from Marc Rotenberg, Executive Director, EPIC to the Honorable Lucy H. Koh (Jul. 12, 2012) ................................................... 26, 27

Letter from Marc Rotenberg, President, EPIC to the Honorable Richard G. Seeborg (Aug. 20, 2013) ........................................................... 26, 28

Michael Loatman, *MacArthur Foundation to Decline Facebook Settlement Funds*, Bloomberg BNA (Sep. 20, 2013)............................................................ 19

Press Release, Fed. Trade Comm'n, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises* (Nov. 29, 2011)........................................................................................................ 10

Restatement (Second) of Torts §652(C) (1977) ........................................................ 3

Restatement (Third) of Unfair Competition §46 (2006)........................................... 3

Richard H. Thaler and Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* (2008) ................................................ 15

Stutzman, Gross, and Acquisti, *Silent Listeners*, 4 J. of Privacy & Confidentiality 2 (2012)........................................................................ 11

Supplemental Complaint of EPIC, In re Facebook (May 5, 2010) ........................ 22

Vindu Goel, *Facebook Deal on Privacy Is Under Attack*, N.Y. Times, Feb. 13, 2014, at B1 ................................................................................ 16

Yabing Lui, et al., *Analyzing Facebook Privacy Settings: User Expectations vs. Reality* (2010)............................................................................... 14

## INTEREST OF AMICUS

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and other Constitutional values.[1]  EPIC maintains two of the most popular web sites in the world concerning privacy – epic.org and privacy.org – and routinely advocates for consumer privacy in matters before the Federal Trade Commission ("FTC") and the US Congress.

EPIC is interested in this case for three reasons. First, EPIC and a coalition of consumer privacy organizations are responsible for the 2011 consent order between the FTC and defendant Facebook concerning the protection of consumer privacy that is impacted by this settlement. Second, EPIC has routinely advised courts in consumer privacy class actions to help ensure that the settlement is aligned with the purpose of the litigation and that the *cy pres* allocations advance the interests of class members. Third, in *Marek v. Lane*, a case that bears a striking similarity to the matter currently before this court, Chief Justice John Roberts

---

[1] Counsel for Objector-Appellants, Intervenor-Plaintiffs-Appellees, and Defendant-Appellees consented to the filing of EPIC's *amicus* brief, but counsel for Plainiffs-Appellees did not respond to our request for consent. EPIC has submitted a motion for leave to file contemporaneous with this brief pursuant to Fed. R. App. P. 29(b). In accordance with Rule 29, the undersigned states that no monetary contributions were made for the preparation or submission of this brief, and this brief was not authored, in whole or in part, by counsel for a party.

1

expressed concerns that reflect views EPIC and others have expressed about class action settlements in consumer privacy cases.

## SUMMARY OF THE ARGUMENT

The Amended Settlement Agreement ("Settlement") before the Court is deeply flawed.  Not only does it allow the defendant company to continue engage in the conduct that was the basis for the initial lawsuit, it gives the company a right to violate the privacy laws of many states that seeks to limit the commercial exploitation of a child's image. The Settlement allows the company to disregard its obligations to the FTC arising from an earlier consent order as well as advertising guidelines intended to narrow the circumstances for commercial endorsement. *Amicus* EPIC has worked dutifully with other consumer privacy organizations to protect the privacy interests of Facebook users and to ensure that settlements in class action cases advance the underlying claims and are aligned with the interests of class members. But this Settlement fails that test for reasons expressed also by Chief Justice Roberts in a similar matter recently before this Court.

## ARGUMENT

### I. The Tort of Misappropriation Is the Cornerstone of Modern Privacy Law

The cornerstone of modern privacy law is the ability of the individual to determine when and under what circumstances their name or likeness will be used by another for commercial benefit. The tort of misappropriation provides, "One who appropriates to his own use or benefit the name or likeness of another is

2

subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts §652(C) (1977). The right of publicity provides, "One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability for the relief appropriate under the rules stated in [the Restatement of Unfair Competition]." Restatement (Third) of Unfair Competition §46 (2006).

Facebook's "Sponsored Stories" advertising technique seeks to take from the individual this key right and to routinely exploit a person's name and image for the company's own commercial gain. The fact that this technique is directed toward minor users of Facebook is of particular concern given the origins of the right at issue in this case.

### A. In 1903 the State of New York Established the First Modern Privacy Law Following the Misuse of a Minor's Image for Commercial Purposes

The first, and arguably most influential, privacy tort case in the United States concerned the use of a minor child's image for a commercial purpose without consent. In *Roberson v. Rochester Folding Box Company*, the New York Court of Appeals considered a claim for invasion of privacy by a young woman whose image had been used without consent in 25,000 posters advertising flour from a flour manufacturer. 171 N.Y. 538, 64 N.E. 442 (N.Y. 1902). Above her image were the words "Flour of the Family" and below her image was the name of the business, "Franklin Mills Flour." (One could easily imagine a similar ad on a

Facebook page today with a caption for a product, the image of a Facebook user, and the name of the company receiving the endorsement.) The images of Miss Roberson, who was a minor at the time and had not consented to the use of her picture, were displayed publicly in stores, warehouses, saloons, and other public places. *Roberson,* 64 N.E. at 449. She charged that "her good name has been attacked, causing her great distress and suffering, both in body and mind." *Id*. Although the New York high court ultimately decided not to accept the novel legal claim, it did encourage the state assembly to do so: "The legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent. In such, event no embarrassment would result to the general body of the law, for the rule would be applicable only to cases provided for by the statute." *Id*. at 545.

Thus in 1903 the New York state assembly enacted a statutory right of privacy. 1903 N.Y. Laws ch. 132, §§ 1-2. The law provided that "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." *Id.* The New York state law is still in effect today, with very little modification. ("A person, firm or corporation that uses for advertising

purposes, or for purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, is guilty of a misdemeanor.") NY Civil Rights Law § 50 (McKinney). Moreover, it became the basis for similar statutory protections across the country concerning the use of personal images for commercial purposes. *See, e.g.,* N.C. Gen. Stat. Ann. § 66-152 (West); VA Code Ann. § 59.1-336; Or. Rev. Stat. Ann. § 646.465 (West); Ala. Code § 8-27-3; Alaska Stat. Ann. § 45.50.910 (West); Ohio Rev. Code Ann. § 1333.61 (West).

Since this first statute was enacted, over half of all states have recognized a right of publicity, or "personality right." Many of these states have passed laws providing additional protection for children, limiting the circumstances when a child's image or name may be used for a commercial purpose. *See*, *e.g.*, Cal. Civ. Code § 3344(a); Fla. Stat. Ann. § 540.08(1), (6); N.Y. Civ. Rights Law § 50; Okla. Stat. Ann. tit. 21, § 839.1; Tenn. Code Ann. § 47-25-1105(a); Va. Code Ann. § 8.01-40(A); Wis. Stat. Ann. § 995.50(2)(b).

It bears emphasizing that the advertising technique that gave rise to all of these privacy laws – the widespread publication of a minor's image without consent placed alongside a caption and a product name – is almost identical to the Sponsored Stories program of defendant Facebook. Thus the Settlement does not simply violate multiple state privacy laws, it seeks to remove the cornerstone of

modern privacy law.

### B. Social Network Services Seek to Extract Commercial Value from Minor Users Without Meaningful Consent

The parties to this Settlement do not simply seek to go forward with an advertising technique that violates state laws, they seek to exploit the desire of young people to share personal information with their friends to generate advertising revenue for defendant Facebook.

Teens rely on social media websites, Facebook in particular, as a common space to interact with their friends and develop their likes, tastes, and relationships. danah boyd, *It's Complicated: the Social Lives of Networked Teens*, Yale University Press (2014). By changing the context or violating the purpose behind teens' interactions on Facebook, Sponsored Stories takes advantage of everyday interactions between teens and recontextualizes them in a way that teens do not (or cannot) understand. *Id.* Furthermore, Facebook users (particularly teenaged users) express themselves through their likes, shares, posts, and other interactions. By reframing this self-expression as a commercial endorsement, Sponsored Stories reduces users' freedom to develop their online personalities.

In a recent case holding that use of the Facebook Like button was speech by the user, and thus protected by the First Amendment, the Fourth Circuit elaborated on the expressive nature of Facebook activity. *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013). "On the most basic level," the court held, "clicking on the 'like' button

literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement. In the context of a political campaign's Facebook page, the meaning that the user approves of the candidacy whose page is being liked is unmistakable." *Id.* at 386. In the political context, liking something was "the Internet equivalent of displaying a political sign in one's front yard, which the Supreme Court has held is substantive speech." *Id.* Critical to the court's analysis of the First Amendment interest was that it was the user's decision to express support, not the company's decision on behalf of the user, that constituted the protected speech. This finding is particularly relevant to teen users, whose burgeoning autonomy and independence are contingent on a strong data privacy framework. *See* Julie Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 Stan. L. Rev. 1373, 1373, 1424 (2000) (explaining that rational-actor models of data privacy ignore that rational, autonomous individuals must take time to experiment and develop: "Autonomy in a contingent world requires a zone of relative insulation from outside scrutiny and interference—a field of operation within which to engage in the conscious construction of self.").

### C. Remarkably, the Proposed Settlement Would Allow Defendant Facebook to Routinely Violate Multiple State Privacy Laws

Despite the important privacy principles protected by numerous states' misappropriation laws, the Settlement authorizes Facebook to use the images of minors without parental consent. Seven states require the affirmative parental

consent for the commercial use of a minor's likeness: California, Florida, New York, Oklahoma, Tennessee, Virginia, and Wisconsin. *See* Cal. Civ. Code § 3344(a); Fla. Stat. Ann. § 540.08(1), (6); N.Y. Civ. Rights Law § 50; Okla. Stat. Ann. tit. 21, § 839.1; Tenn. Code Ann. § 47-25-1105(a); Va. Code Ann. § 8.01-40(A); Wis. Stat. Ann. § 995.50(2)(b). The Agreement would authorize conduct clearly in violation of these state privacy laws, and should be rejected on that basis alone. But the Settlement should also be rejected because it would provide no meaningful relief to Facebook users and is flawed.

## II. The Authorization of Unlawful Conduct is Just One of Several Indicators That the Settlement Is Flawed

The authorization to violate state privacy laws is just one of several indications that the Settlement is deeply flawed. The Settlement also fails to comply with a Consent Order of the FTC and the FTC's Advertising Guidelines. The Settlement provides no meaningful privacy benefit to Facebook users and fails to allocate funds to organizations aligned with the interests of class members. It is also significant that a major foundation and an advocacy organization, both named as *cy pres* beneficiaries, chose not to accept funds from the Settlement. The Settlement is so flawed that organizations that stand to benefit have chosen not to participate.

**A. The Settlement Fails to Comply with Requirements Arising From a Prior Order Against Defendant Facebook Set Out by the Federal Trade Commission**

Under the Settlement, Facebook is authorized to publish user endorsements without first obtaining the express consent of its users, in direct contravention of the clear terms of the 2012 FTC Order. The FTC Order came about because of the efforts of EPIC and other consumer privacy organizations that filed an extensive complaint with the Commission when Facebook unilaterally changed users' privacy settings. The FTC settlement barred Facebook from:

> making any further deceptive privacy claims, requires that the company get consumers' approval before it changes the way it shares their data, and requires that it obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years. Specifically, under the proposed settlement, Facebook is:
>
> - barred from making misrepresentations about the privacy or security of consumers' personal information;
> - required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;
> - required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;
> - required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and
> - required, within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.

Press Release, Fed. Trade Comm'n, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises* (Nov. 29, 2011).[2]

The FTC also explicitly acknowledged the work of EPIC and other consumer privacy organizations in obtaining the settlement. *Id.* ("Facebook's privacy practices were the subject of complaints filed with the FTC by the Electronic Privacy Information Center and a coalition of consumer groups.").

However, under the Settlement in this case, Facebook may create advertisements using an individual's "name, and profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand [they] like) served or enhanced by [Facebook]." Erin Egan, *Proposed Statement to our Governing Documents*, Facebook (Aug. 29, 2013).[3] By associating a user's "name, profile picture, content, and information" with commercial content, Facebook creates new advertisements. These advertisements represent "nonpublic user information" because they consist of information that had previously been restricted by the user's privacy settings, specifically the user's choice whether or not to disclose information for a particular purpose. *See* Facebook, *Data Use Policy* at II (2013) (describing the privacy settings under

---

[2] *Available at* http://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

[3] https://www.facebook.com/notes/facebook-site-governance/proposed-updates-to-our-governing-documents/10153167395945301.

"control each time you post" and "control over your timeline").[4] Furthermore, these advertisements are disclosed to "third parties": the user's Facebook contacts. Thus, the Settlement violates the FTC Order's prohibition on sharing information without user consent.

The change in Facebook privacy settings, which was the core of EPIC's complaint to the FTC, is also a central problem for networked teens. As danah boyd has explained, "Over the course of this study, Facebook's privacy settings have changed tremendously. This has complicated teens' understanding of how to navigate contexts on Facebook and in social media more generally." boyd at 225 n.6. *See also* Stutzman, Gross, and Acquisti, *Silent Listeners*, 4 J. of Privacy & Confidentiality 2, 7 (2012).

### B. The Settlement Fails to Comply With Federal Trade Commission's Recently Updated Advertising Guidelines

The FTC has recently revised its advertising guidelines concerning the use of endorsements and testimonials. *See* Guidelines Concerning the Use of Endorsements and Testimonials, 16 C.F.R. § 255 (2009).[5] These FTC guidelines are intended to "address the application of Section 5 of the FTC Act, 15 U.S.C. § 45, to the use of endorsements and testimonials in advertising." 16 C.F.R. § 255.0(a). The FTC rules make clear that "practices inconsistent with these Guides

---

[4] https://www.facebook.com/full_data_use_policy.
[5] *Available at*
http://www.ftc.gov/os/2009/10/091005revisedendorsementguides.pdf.

may result in corrective action by the Commission." *Id.* The so-called "native advertising," the use of tailored ads based on the interests or activities of users, on social media implicates several provisions of the guidelines. First, "[e]ndorsements must reflect the honest opinions, findings, beliefs, or experience of the endorser." *Id.* § 255.1(a). Additionally, "[w]hen the advertisement represents that the endorser uses the endorsed product, the endorser must have been a bona fide user of it at the time the endorsement was given." *Id.* § 255.1(c).

In March 2013, the FTC also revised its advertising guidelines, known as the "Dot Com Disclosures." *See* Fed. Trade Comm'n, *Dot Com Disclosures* (2013).[6] In general, the guidelines state that disclosures must be presented "clearly and conspicuously" to ensure that an advertisement is not deceptive. *Id.* at 6. "The key is the overall net impression of the ad – that is, whether the claims consumers take from the ad are truthful and substantiated." *Id.* When evaluating the prominence of the disclosure, the Commission considers size, color, and graphics of the disclosure. *Id.* at 17. The disclosure guidelines state that in contexts where space is limited, such as in social media, "[s]hort-form disclosures might or might not adequately inform consumers of the essence of a required disclosure." *Id.* at 16.

Facebook's Sponsored Stories run afoul of the Commission's endorsement and advertising guidelines, which require that endorsements "reflect the honest

---

[6] *Available at* http://ftc.gov/os/2013/03/130312dotcomdisclosures.pdf.

12

opinions, findings, beliefs, or experience of the endorser." 16 C.F.R. § 255.1(a).

Many Sponsored Stories violate this requirement. Related Posts, for example,

contain content that users have never seen, and therefore could not have endorsed.

Furthermore, Related Posts implicate the advertising guidelines in the clarity and

prominence of their disclosures. The connection between the content that the

Facebook user actually liked or interacted with and the Related Post is denoted

with the term "related," but the size of the term, combined with the advertisements

proximity to an explicit user action – such as likes, shares, or check ins – has given

audiences the impression that users choose to associate with Related Posts.

Although the FTC's Guidelines are not binding on this court, the fact that

the Settlement endorses practices disfavored by the FTC is further evidence that it

is flawed and should be rejected.

### C. The Settlement Adopts the Fiction of "Deemed Consent" to Allow the Use of a Minor's Image Without Actual Consent

The Settlement's incorporation of the "deemed consent" provision in the

terms of service eviscerates any meaningful limits over the commercial

exploitation of the images and names of young Facebook users. The provision

states:

> If you are under the age of eighteen (18), or under any other
> applicable age of majority, you represent that at least one of your
> parents or legal guardians has also agreed to the terms of this section
> (and the use of your name, profile picture, content, and information)
> on your behalf.

13

ER 31 (Amended Settlement Agreement and Release ("ASAR") § 2.1(a)). This provision, far from requiring that Facebook obtain affirmative express consent from a responsible adult, attempts to "deem" that teenagers "represent" that a parent, who may have been given no notice at all, have consented to give up teens' private information. This provision is also contrary to the 2012 FTC Order and to the Commission's recognition that teens are a sensitive group, owed extra privacy protections. Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change* 60 (2012).[7]

The Commission further recognized that the "notice-and-choice" model of privacy protection, "which encouraged companies to develop privacy policies describing their information collection and use practices, led to long, incomprehensible privacy policies that consumers typically do not read, let alone understand." *Id*. This is particularly true of Facebook. Examinations of Facebook's privacy settings have found that they regularly fail to allow consumers to achieve their privacy preferences. One study reported that "privacy settings match users' expectations only 37% of the time, and when incorrect, almost always expose content to more users than expected." Yabing Lui, et al., *Analyzing Facebook Privacy Settings: User Expectations vs. Reality* (2010).[8] Furthermore, individuals tend to follow default settings, even when given the chance to change those

[7] *Available at* http://www.ftc.gov/os/2012/03/120326privacyreport.pdf.
[8] *Available at* http://www.mpi-sws.org/~gummadi/papers/imc081s-liu.pdf.

settings. Richard H. Thaler and Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* (2008). These behavioral trends expose the extreme unlikelihood that teens give any kind of real consent when confronted with the "deemed consent" provision. Even if teens acknowledge, read, and understand the provision, they are nevertheless more likely to opt for the default "consent" rather than select a different option.

### D. The Settlement Would Establish No Meaningful New Safeguards for Facebook Users

The Settlement does not establish any new safeguards or otherwise provide meaningful privacy benefits to users. As one of the named *cy pres* recipients who subsequently withdrew from the settlement explained, "In exchange for releasing Facebook from liability for any past harm to minors that was caused by the use of the names or images of teenagers in Facebook's Sponsored Stories, minors receive almost nothing." Letter from Campaign for a Commercial-Free Childhood to the United States Court of Appeals for the Ninth Circuit (Feb. 12, 2014).[9] As a result, the Settlement has the effect of absolving Facebook for its past misuse of user data while failing to limit Facebook's advertising practices going forward.

This failure is highlighted by the withdrawal from the Settlement by a named *cy pres* recipient. The Campaign for a Commercial-Free Childhood

---

[9] *Available at*
http://www.commercialfreechildhood.org/sites/default/files/CCFCAmicusLetter.pdf.

("CCFC") withdrew after it determined that, "[n]ot only is the settlement bad, it is worse than no settlement at all." *Id*. As a result, CCFC "decided to reject the approximately $290,000 - more than 90% percent of CCFC's annual budget" that it anticipated receiving as a *cy pres* beneficiary. *Id*. CCFC determined, "After careful reflection and a deeper understanding of the settlement," that "it was wrong to agree to serve as a *cy pres* recipient." *Id*.  CCFC concluded that "the *Fraley* Settlement Agreement harms vulnerable teenagers and their families under the guise of helping them." *Id*. And that, "Despite the significant financial loss that this could represent, CCFC can no longer be a part of a settlement that it now understands would directly conflict with its mission." *Id.*

CCFC's withdrawal has alerted the public to the deficiency of the Settlement now before the Court. The *New York Times* article on the CCFC decision emphasized the infrequency of a *cy pres* recipient's withdrawal, noting, "In a rare reversal, one child advocacy group that initially supported the $20 million settlement, the Campaign for a Commercial-Free Childhood, has now concluded the deal offers little protection to children and plans to ask the appeals court to reject it." Vindu Goel, *Facebook Deal on Privacy Is Under Attack*, N.Y. Times, Feb. 13, 2014, at B1. The *Washington Post* noted that the CCFC's actions reflected Judge Seeborg's own ambivalence about the adequacy of the Settlement. ("The group now says it will not accept the money unless Facebook strengthens its

privacy protections for children. . . . In approving the settlement, Judge Richard Seeborg acknowledged that the agreement fell far short of requests by consumers and public interest groups.") Cecilia Kang, *Parents Resume Privacy Fight vs. Facebook Over Use of Children's Images in Ads*, Wash. Post (Feb. 13, 2014).[10] Almost every report drew attention to the relative size of the *cy pres* allocation that CCFC rejected, noting that the amount was more than 90% of the group's 2013 budget. *See, e.g.,* Jessica Guynn, *Facebook Social Ads Settlement Under Fire from Children's Advocates*, L.A. Times (Feb. 13, 2014);[11] Karen Gullo, *Facebook Advertising Settlement Challenged by Consumer Group*, Businessweek (Feb. 13, 2014);[12] Barbara Ortutay, *Facebook faces opposition to privacy settlement*, Associated Press (Feb. 14, 2014).[13]

It is virtually unprecedented for an organization that is the named recipient of *cy pres* funds to withdraw because of its determination that the settlement is unfair to class members. CCFC's decision underscores the views of amici that the Settlement should be rejected.

---

[10] *Available at* http://www.washingtonpost.com/business/technology/parents-resume-privacy-fight-vs-facebook-over-use-of-childrens-images-in-ads/2014/02/12/5ceb9f82-9430-11e3-b46a-5a3d0d2130da_story.html.

[11] *Available at* http://www.latimes.com/business/technology/la-fi-tn-facebook-social-ads-settlement-under-fire-from-childrens-advocates-20140213,0,2537341.story.

[12] *Available at* http://www.businessweek.com/news/2014-02-13/facebook-accord-violates-laws-protecting-children-court-told.

[13] *Available at* http://bigstory.ap.org/article/facebook-faces-opposition-privacy-settlement.

**E. The Settlement Fails to Allocate *Cy Pres* Funds to Consumer Privacy Organizations Aligned with the Interests of Class Members**

Despite a growing skepticism in the Ninth Circuit regarding *cy pres* awards that are not aligned with the interests of class members, the Settlement Agreement excludes those organizations that have pursued efforts on behalf of Facebook users. For example, twelve consumer privacy organizations, including EPIC, were responsible for the FTC's 2012 Order discussed *supra* at II.A. However, all but one of the twelve organizations that instigated the investigation were excluded from the allocation of funds in the instant matter.

Such misallocation of funds is clearly detrimental to the interests of class members, contrary to case law, and should not be accepted. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) ("[The doctrine of *cy pres*] allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries."). *See also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990) ("where *cy pres* is considered, it will be rejected when the proposed distribution fails to provide the 'next best' distribution."); *Dennis v. Kellogg Co.*, No. 11-55674, 2012 WL 2870128 at *6 (9th Cir. 2012) ("When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court.").

Other proposed beneficiaries have recognized this deficiency. The MacArthur Foundation declined to participate as a *cy pres* recipient following its selection in August 2013. The Foundation issued a statement, explaining that its goals and mission did not appropriately align with the interests of the affected class members:

> [..]MacArthur did not ask to participate. The Foundation has informed lawyers representing both parties in the settlement that we respectfully decline to accept any settlement funds. Instead, in this case, we have suggested those funds be redirected to other non-profit organizations engaged in the underlying issues and identified in the settlement as possible recipients.[..]

Michael Loatman, *MacArthur Foundation to Decline Facebook Settlement Funds*, Bloomberg BNA (Sep. 20, 2013).[14]

In another very similar matter, in which class action attorneys claimed a benefit for class members far less than what EPIC had obtained by virtue of a petition to the FTC, EPIC challenged the proposed *cy pres* allocation. *EPIC, Privacy Groups File Objection to Proposed Google Buzz Settlement* (Apr. 1, 2011).[15] The court in that case did "not find good cause to exclude EPIC from the list of recipients of the *cy pres* funds." *In re Google Buzz Privacy Litigation*, No. 10-672, 2011 WL 7460099 at 2 (N.D. Cal. entered Mar. 31, 2011). The court noted EPIC demonstrated "that it is a well-established and respected organization within

---

[14] *Available at* http://www.bna.com/macarthur-foundation-decline-b17179877204/.
[15] https://epic.org/2011/04/epic-privacy-groups-file-objec.html.

the field of Internet privacy and that it has sufficiently outlined how the *cy pres* funding will be used to further the interests of the class." *Id*. In the Order Granting Final Approval of the Class Action Settlement, the court reallocated *cy pres* funds to EPIC. *Id*. at 6. *See also*, *Mirfasihi v. Fleet Mortgage,* No. 01-722, 2007 WL 2066503 at 2 (N.D. Ill. July 17, 2007) (designating the bulk of the *cy pres* award to EPIC).

**III. Chief Justice Roberts Expressed Wide-ranging Concerns About a Similar Settlement Arising in a Similar Consumer Privacy Case This Term Against Defendant Facebook**

On November 4, 2013, the United States Supreme Court denied a Petition for Writ of Certiorari in *Marek v. Lane*, another case involving claims brought by users against Facebook for privacy violations. Chief Justice John Roberts wrote separately to emphasize that there are

> fundamental concerns surrounding the use of [*cy pres*] remedies in class action litigation, including when, if ever, such relief should be considered; how to assess its fairness as a general matter; whether new entities may be established as part of such relief; if not, how existing entities should be selected; what the respective roles of the judge and parties are in shaping a *cy pres* remedy; how closely the goals of any enlisted organization must correspond to the interests of the class; and so on.

134 S. Ct. 8 (2013). Justice Roberts went on to explain that, in the future, "the Court may need to clarify the limits on the use of such remedies." *Id*.

Justice Roberts expressed concern over the Facebook Beacon settlement in particular because "[i]n the end, the vast majority of Beacon's victims got neither"

damages nor injunctive relief prohibiting the unlawful conduct that injured them. *Id*. This was the case because Facebook only promised to "discontinue the 'Beacon' program itself," and counsel even "conceded at the fairness hearing in the District Court that nothing in the settlement would preclude Facebook from reinstituting the same program with a new name." *Id*. The parties also agreed to "expand the settlement class barred from future litigation" to include both the "opt-out" class proposed in the original complaint and any potential future "opt-in" class.

### A. Many of the "Fundamental Concerns" That Chief Justice Roberts Identified in the *Lane* Settlement Are Present in the *Fraley* Settlement

The Settlement in *Fraley* presents many of the same problems identified by Chief Justice Roberts in *Lane*.

#### 1) *"Disconcerting" allocation of cy pres funds and selection of cy pres entities*

Similar to the settlement in *Lane*, the *Fraley* Settlement includes a "disconcerting allocation" of *cy pres* funds, which fails to provide funding for consumer privacy organizations that were actively involved in advocating for Facebook users before the FTC.

Several of the consumer privacy groups excluded from the proposed *cy pres* distribution were primarily responsible for initiating, pursuing, and finalizing the Facebook matter with the FTC. *See* Complaint of EPIC et al., In re Facebook, Inc. (Dec. 17, 2009). The groups also filed a supplemental 16-page complaint with the

FTC when more evidence became available. *See* Supplemental Complaint of EPIC, In re Facebook (May 5, 2010).[16] Following the FTC's announcement of a proposed settlement and pursuant to a request for public comment, consumer privacy groups also provided 31 pages of detailed recommendations to the Commission on the proposed order to ensure that the interests of Facebook users were adequately protected. *See* EPIC, Comments to the Federal Trade Commision, In re Facebook, FTC File No. 092 3184 (Dec. 27, 2011).[17]

The final FTC Order reflected many of the factual findings and proposed relief set out in the initial complaint filed the consumer privacy organizations. The Commission acknowledged the groups' substantial role in this matter. *See* Letter from David Vladeck, Director, Fed. Trade Comm'n, Bureau of Consumer Protection, to Marc Rotenberg, Director, EPIC (Jan. 14, 2010) ("Thank you for your recent complaint to the Commission regarding changes to Facebook's privacy settings . . .Your most recent complaint raises issues of particular interest for us at this time.");[18] Letter from Donald S. Clark, Secretary, Fed. Trade Comm'n, to Marc Rotenberg et. al (July 27, 2012) ("The Commission thanks EPIC for its

---

[16] *Available at* http://epic.org/privacy/facebook/EPIC_FTC_FB_Complaint.pdf.
[17]*Available at*  http://epic.org/privacy/facebook/Facebook-FTC-Settlement-Comments-FINAL.pdf.
[18] *Available at*
https://epic.org/privacy/inrefacebook/Facebook_Vladeck_Letter.pdf.

petition and other correspondence about Facebook's privacy practices and appreciates its support of the proposed complaint.").[19]

But remarkably in the *Fraley* matter, which raised only a small subset of the issues the consumer privacy groups pursued with the FTC, EPIC and other consumer privacy organizations were excluded by class counsel from the proposed *cy pres* allocation. The proposed settlement instead includes a dozen organizations that *did not participate* in the FTC case against Facebook or propose any relief for Facebook users.

### 2) Use of class action settlement to insulate defendant from related claims

Under the *Fraley* Settlement all class and subclass members who do not affirmatively request to be excluded will be barred from bringing suit over any the "released claims" in this case. The Settlement provides in Section 5.2:

> **5.2 Class Members' Release.** Upon the entry of the Final Order and Judgment, Plaintiffs and *all Class Members, including all Minor Subclass Members* (and their parents or legal guardians on all Minor Subclass Members' behalf), who do not validly and timely request to be excluded from the proposed Settlement, and each of their respective successors, assigns, legatees, heirs, and personal representatives (collectively the "Releasing Parties") shall be deemed to *have fully, finally, and forever released*, relinquished, and discharged against Facebook and all other persons and entities, including but not limited to persons and entities that have purchased Sponsored Stories from Facebook, and each of their direct or indirect parents, wholly or majority-owned subsidiaries, affiliated and related entities, predecessors, successors and assigns, partners, privities, and

---

[19] *Available at* https://epic.org/privacy/facebook/Facebook-Ltr-To-EPIC-07-27-12.pdf.

any of their present and former directors, officers, employees, shareholders, agents, representatives, attorneys, accountants, insurers, and all persons acting by, through, under, or in concert with them, or any of them (collectively the "Released Parties"), *all manner of action*, causes of action, claims, demands, rights, suits, obligations, debts, contracts, agreements, promises, liabilities, damages, charges, penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known or unknown claims, in law or equity, fixed or contingent, *which the Releasing Parties have or may have against the Released Parties arising out of or relating to any of the acts*, omissions, or other conduct that was or could have been alleged in the Action, *including but not limited to any and all acts, omissions, or other conduct related to the display of any Class Member's name*, nickname, pseudonym, profile picture, photograph, likeness, or identity in a Sponsored Story ("Released Claims").

ER 44 (ASAR § 5.2) (emphasis added).

Through this settlement Facebook will perfect its immunity from all other misappropriation claims arising from the Sponsored Stories program prior to the conclusion of this case. Many Facebook users live in states that require affirmative parental consent for the use of a minor's likeness for commercial gain, but those users would be barred from seeking relief under this Settlement. Other users who would have rightfully expected Facebook's compliance with the August 2012 FTC Order would be barred from seeking relief for unfair business practices associated with the Sponsored Stories program.

**B. The Ninth Circuit Has Previously Expressed Concern About the Selection of *Cy Pres* Beneficiaries Not Aligned with the Interests of Silent Class Members**

This Circuit has repeatedly emphasized that "[w]hen selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court." *Dennis v. Kellogg, Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (citing *Nachschin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011)). "Even where *cy pres* is considered, it will be rejected when the proposed distribution fails to provide the "next best" distribution." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.3d 1301, 1308 (9th Cir. 1990).

Prior to the Supreme Court's denial of Certiorari in *Lane*, the Ninth Circuit denied the appellants' petition for rehearing *en banc*, over the dissent of six circuit judges. In their dissenting opinion, the judges noted that Facebook's "Digital Trust Foundation," which was the proposed *cy pres* recipient in *Lane*, had "*no* record of service" and its award of settlement funds "simply does not advance the objectives of the statutes upon which plaintiffs relied in their suit." *Marek v. Lane*, 703 F.3d 791, 793-94 (9th Cir. 2013). As the judges explained, the new Facebook-controlled *cy pres* beneficiary created by the proposed settlement in *Lane* might be able to " teach Facebook users how to create strong passwords, tinker with their privacy

25

settings, and generally be more cautious online, but it can't teach users how to protect themselves from Facebook's deliberate misconduct." *Id*. at 794-95.

## IV. Amici EPIC and Others Have Actively Sought to Improve the Settlement Terms But Still Conclude that the Final Settlement is Fatally Flawed and Must Be Rejected

EPIC and other consumer privacy organizations urged the courts below that considered this matter to modify the settlement terms to protect the interests of class members, to advance the purpose of the litigation, and to safeguard important privacy interests. *See* Letter from Marc Rotenberg, President, EPIC to the Honorable Richard G. Seeborg (Aug. 20, 2013) [hereinafter Seeborg Letter];[20] Letter from Marc Rotenberg, Executive Director, EPIC to the Honorable Lucy H. Koh (Jul. 12, 2012) [hereinafter Jul. 12th Koh Letter];[21] Letter from EPIC et al. to the Honorable Lucy H. Koh (Jul. 11, 2012) [hereinafter Jul. 11th Koh Letter].[22]

EPIC first addressed the inadequacy of the injunctive relief offered under the proposed settlement in a July 12, 2012 letter to Judge Koh. In that letter, EPIC described how "Facebook's advertising strategies have consistently threatened the ability of consumers to control their image." July 12th Koh Letter at 1. EPIC described Facebook's repeated attempts to profit off the appropriation of user

---

[20] *Available at* http://epic.org/privacy/facebook/Seeborg-Ltr-8-20-12.pdf.
[21] *Available at* http://epic.org/privacy/facebook/EPIC-Ltr-Koh-Fraley%207-12-12.pdf.
[22] *Available at* http://epic.org/privacy/facebook/EPIC-et-al-Fraley-Cy-Pres-Ltr-7-12-12.pdf.

images, including the "Beacon" program that led to an FTC consent decree and a class action lawsuit. *Id* at 2. EPIC identified three critical flaws in the proposed settlement: (1) the reliance on a "notice and choice" privacy model, (2) the lack of a clear definition for the proposed user privacy controls, and (3) the "opt-out" nature of the program. *Id*. at 3-4. EPIC emphasized that the effect of the proposed settlement would be "to allow Facebook to continue the very business practices that gave rise to this lawsuit." *Id*. at 5.

EPIC argued that the "*mere opportunity* that class members might control their appearance in Sponsored Stories cannot provide a benefit to the class because this possibility already exists: users can avoid Sponsored Stories by avoiding interactions (like check-ins, posts, etc.) with products with which they do not wish to be associated." July 12th Koh Letter at 5. EPIC argued that this is an especially hollow remedy given what we now know about consumer behaviors and default rules. The "default setting is likely to go unchanged by the class members, as individuals tend to follow default settings even when given the chance to change these settings." *Id*. at 5 (citing Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* (2008)). By allowing Facebook to maintain a default "consent" rule regarding user Sponsored Stories, the proposed settlement essentially ensures that they will not be enabled.

EPIC and other consumer privacy organizations also addressed the unfair distribution of *cy pres* funds in the proposed settlement agreement in a letter to Judge Koh on July 11, 2012. *See* July 11th Koh Letter. The letter explained that

> The interests of the class members are best served by supporting those consumer, privacy, and academic organizations that routinely represent class members before federal and state agencies, that seek to establish stronger privacy protections for Facebook users, and that provide direct assistance to those who confront privacy problems.

*Id*. at 2-3. EPIC and the other consumer privacy organizations have advocated on behalf of Facebook users before the FTC and other government agencies. The organizations further explained that "[t]he risk of improper exclusion of an appropriate *cy pres* recipient is very real," *id*. at 8, as Judge Ware recognized in the Google Buzz Order. *In re Google Buzz Privacy Litigation*, No. 10-672, 2011 WL 7460099 (N.D. Cal. Mar. 31, 2011).

The case was then reassigned to Judge Richard Seeborg. ER 195 (reassigning case pursuant to Order of Recusal, ECF No. 209). Judge Seeborg denied preliminary approval of the proposed settlement agreement because the parties had not adequately explained the basis for their proposed $10 million settlement fund. ER 138. Subsequent to the rejection of the preliminary agreement, EPIC wrote to Judge Seeborg to highlight the significance of the FTC's consent order with Facebook regarding privacy violations. Seeborg Letter at 1. Compared

with the relief granted by the FTC Order, see discussion *supra* at II.A, the proposed benefits offered in the Settlement are inconsequential.

In its order denying preliminary approval, the lower court held that Facebook had failed to provide an actual relief to class members. ER 138. The parties subsequently amended the Settlement to provide for a $10 million fund that would be distributed to class members upon application. ER 33-36. As a result of this change, a limited number of class members (less than 1%) are eligible to receive monetary relief of up to $15 each. *Id*. EPIC acknowledges this is a change in the Settlement that benefits some of the class members, and resulted in part from a recommendation to the lower court. However, while it is important to provide relief to injured parties for past harms, it is not sufficient in light of Facebook's planned exploitation of user images and identities. In such a circumstance the relief to class members is wholly insufficient, particularly when the vast majority of Facebook users will receive nothing for the future use of their name and likeness for commercial endorsement.

The amendments approved by the lower court have not adequately addressed the flaws in the Settlement. Under the Settlement, Facebook would be allowed to continue the very practice that gave rise to the users' cause of action. The Settlement would authorize the unlawful use of minor images without parental consent, and would provide no meaningful injunctive relief to class members. In

addition, the Settlement includes an unfair distribution of potential *cy pres* funds. One of the *cy pres* beneficiaries designated in the Settlement has even declined to accept the proposed award because of this unfairness. Any benefits to the silent class members will be illusory, and in exchange they will have lost their legal right to challenge Facebook's privacy violations. The Court should reject this settlement because it would authorize unlawful conduct and is fundamentally unfair to class members and provides no meaningful benefit to Facebook users.

## CONCLUSION

Amicus respectfully requests this Court vacate the lower court's approval of the settlement.

Respectfully submitted,


___*/s/ Marc Rotenberg*_____
Marc Rotenberg
   *Counsel of Record*
Alan Butler
Julia Horwitz
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 7,000 words of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(B)(i). This brief contains 6,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14 point Times New Roman style.

Dated:  February 20, 2014

_____/s/ Marc Rotenberg_____
Marc Rotenberg
    *Counsel of Record*
Alan Butler
Julia Horwitz
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140

31

# CERTIFICATE OF SERVICE

I hereby certify that on this 20th Day of February, 2014, the foregoing Brief of *Amicus Curiae* Electronic Privacy Information Center in Support of Appellants was electronically filed with the Clerk of the Court, and thereby served upon counsel for the parties *via* electronic delivery.

Dated:  February 20, 2014

<div style="margin-left:40%">

___/s/ Marc Rotenberg_____
Marc Rotenberg
   *Counsel of Record*
Alan Butler
Julia Horwitz
Electronic Privacy Information Center
1718 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 483-1140

</div>