**Docket Nos. 13-16819 (L), 13-16918, 13-16919,
13-16929, 13-16936, 13-17028, 13-17097**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———————◆———————

ANGEL FRALEY, PAUL WANG, JAMES H. DUVAL, a minor, by and through James Duval,
as Guardian ad Litem, WILLIAM TAIT, a minor, by and through Russell Tait,
as Guardian ad Litem, SUSAN MAINZER, LUCAS FUNES and INSTAGRAM, LLC,

*Plaintiffs and Appellees,*

C.M.D., T.A.B., H.E.W., B.A.W., A.D.Y. and R.P.Y.,

*Intervenors, Plaintiffs and Appellees,*

v.

K.D. and C.D., through their father, Michael Depot,

*Objectors and Appellants,*

v.

FACEBOOK, INC.,

*Defendant and Appellee.*

———————————————

*Appeal from a Decision of the United States District Court for the Northern District of California,
No. 11-cv-01726-RS · Honorable Richard G. Seeborg*

## BRIEF OF APPELLANTS

ROBERT C. FELLMETH, ESQ.
CHRISTINA M. RIEHL, ESQ.
ELISA M. D. WEICHEL, ESQ.
CHILDREN'S ADVOCACY INSTITUTE
CENTER FOR PUBLIC INTEREST LAW
University of San Diego School of Law
5998 Alcala Park
San Diego, California 92110-2492
(619) 260-4806 Telephone
(619) 260-4753 Facsimile

*Attorneys for Objectors and Appellants,
K. D. and C. D., through their father, Michael Depot*



COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION ................................................... 5

STANDARD OF REVIEW ............................................................... 6

STATEMENT OF ISSUES PRESENTED ......................................... 6

STATEMENT OF THE CASE .......................................................... 8

    A.    Facts Relevant to the Issues Submitted for Review .............................. 8

    B.    Relevant Procedural History ................................................ 13

    C.    Rulings Presented for Review .............................................. 17

SUMMARY OF ARGUMENT .......................................................... 18

ARGUMENT ................................................................................. 19

    I.    Given the Posture of this Case, the District Court Properly
Plays an Active Role in Determining Whether a Settlement
Agreement is Fair, Reasonable, and Adequate ................................... 19

        A.    The Pre-Certification Stage of the Case Requires Greater
Court Inquiry into the Settlement Agreement as Sufficiently
Fair, Adequate and Reasonable .............................................. 23

        B.    The Opinion of Class Members and *Cy Pres* Recipients
that the Settlement Should not be Approved Commends
Some Inquiry into it as Fair, Reasonable, and Adequate .......... 34

        C.    The Repeated Threats by Facebook of Serious Personal
Liability for the Teen Child Subclass Representatives if
the Case Proceeds Warrants Special Attention as "Forced
Collusion" ........................................................................... 35

    II.   The District Court Erred in Approving a Settlement
That Violates Statutes and Constitutional Protections ......................... 38

        A.    The Settlement "Blanket Waiver" Violates California Law ..... 39

        B.    It is Neither Fair, Reasonable, nor Adequate to Violate
the Constitutional Fundamental Liberty Interest to Parent ....... 50

C.   The Settlement Violates the Explicit Privacy Guarantee of Article I, Section 1 of the California Constitution, Directly Applicable to Private Actors Such as Facebook.........50

D.   The Settlement Authorizes a *Per Se* Antitrust Offense ............51

CONCLUSION ....................................................................................................55

CERTIFICATE OF COMPLIANCE.......................................................................57

STATEMENT OF RELATED CASES ...................................................................58

CERTIFICATE OF SERVICE ..............................................................................59

# TABLE OF AUTHORITIES

## CASES

*Bhan v. NME Hosps. Inc.,*
   929 F.2d 1404 (9th Cir. 1991) ........................................................54

*Blough v. Holland Realty, Inc.,*
   574 F.3d 1084 (9th Cir. 2009) ........................................................54

*Brantley v. NBC Universal, Inc.,*
   675 F.3d 1192 (9th Cir. 2012) ........................................................53

*Brooks v. State Bd. of Elections,*
   848 F. Supp. 1548 (S.D. Ga. 1994) ................................................38

*Central Sales v. Merck-Medco,*
   504 F.3d 229 (2nd Cir. 2007) .........................................................27

*County of Tuolumne v. Sonora Community Hospital,*
   236 F.3d 1148 (9th Cir. 2001) ........................................................54

*Datagate, Inc. v. Hewlett Packard Company,*
   60 F.3d 1421 (9th Cir. 1995) ..........................................................54

*Dennis v. Kellogg Co.,*
   697 F.3d 858 (9th Cir. 2012) .............................................20, 23, 24

*Fleury v. Richemont North America, Inc.,*
   2008 U.S. Dist. LEXIS 64521 ........................................................53

*Gipson v. Davis Realty Co.,*
   215 Cal.App.2d 190 (1963) ............................................................42

*Girsh v. Jepson,*
   521 F.2d 153 (3d Cir. 1975) ...................................................19, 20

*Graham v. Florida,*
   560 U. S. 48 (2010).........................................................................40

*Grunin v. Int'l House of Pancakes,*
   513 F.2d 114 (8th Cir. 1975) .............................................19, 38, 54

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ...........................................6, 19, 23, 33

*Hill v. National Collegiate Athletic Ass'n,*
  7 Cal. 4th 1 (1994) ...................................................................50, 51

*I.B. v. Facebook, Inc.,*
  905 F. Supp. 2d 989 (2012) ....................................................42, 45

*Ill. Tool Works, Inc. v. Indep. Ink, Inc.,*
  547 U.S. 28 (2006)............................................................................53

*In re Beef Industry Antitrust Litigation,*
  607 F.2d 167 (5th Cir. 1979) .........................................................20

*In re Bluetooth Headset Product Liability,*
  654 F.3d 935 (9th Cir. 2011) ...................................................23, 24

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768s (3d Cir. 1995)......................................................25, 33

*In re Literary Rights,*
  654 F.3d 242 (2nd Cir. 2011) ........................................................27

*International Salt v. United States,*
  332 U.S. 392 (1947)..........................................................................52

*Isby v. Bayh,*
  75 F.3d 1191 (7th Cir. 1996) ..........................................................38

*Jefferson Parish Hosp. Dist. No.2 v. Hyde,*
  466 U.S. 2 (1984)..............................................................................52

*Lassiter v. Department of Social Services,*
  452 U.S. 18 (1981)............................................................................50

*Mars Steel v. Continental Illinois Nat'l bank & Trust,*
  834 F.2d 677 (7th Cir. 1987) ..........................................................26

*Marx v. Gen. Revenue Corp.,*
  133 S. Ct. 1166 (2013)......................................................................49

*Maywalt v. Parker & Parsley Petroleum Co.,*
  67 F.3d 1072 (2d Cir. 1995) .............................................................6

*Miller v. Alabama/Johnson v. Hobbs,*
  __U.S.__, 132 S. Ct. 2455 (2012) .................................................40

*Niemann v. Deverich,*
  98 Cal.App.2d 787 (1950) ...............................................................40

*Northern Pacific R. Co. v. U.S.,*
 356 1 (1958) ............................................................................................... 52

*Officers for Justice v. Civil Service Comm'n,*
 688 F2d 615 (9th Cir. 2011) ...................................................................... 38

*Omega Eng'g, Inc. v. Omega*,
 432 F.3d 437 (2d Cir. 2005) ........................................................................ 6

*Ortiz v. Fibreboard Corp.,*
 527 U.S. 815 (1999) .................................................................................... 27

*People v. National Association of Realtors,*
 155 Cal.App.3d 578 (1984) ........................................................................ 55

*Perfect 10 v. CCBill,*
 340 F.Supp.2d 1077, *as reversed and affirmed at*
 481 F.3d 751 (9th Cir. 2007) ..................................................................... 39

*Reed v. General Motors Corp,*
 703 F.2d 170 (5th Cir. 1983) ..................................................................... 34

*Robertson v. Nat'l Basketball Ass'n,*
 556 F.2d 682 (2d Cir. 1977) ...................................................................... 38

*Roper v. Simmons*,
 543 U. S. 551 (2005) ................................................................................... 40

*Santosky v. Kramer,*
 455 U.S. 745 (1982) .................................................................................... 50

*Sheehan v. SF 49ers,*
 45 Cal. 4th 992 (2009) ......................................................................... 50, 51

*Sisco v. Cosgrove,*
 51 Cal. App. 4th 1302 (1996) ................................................................... 43

*Sparks v. Sparks,*
 101 Cal.App.2d 129 (1950) ........................................................................ 40

*Troxel v. Granville,*
 530 U.S. 57 (2000) ...................................................................................... 50

*UAW v. GMC,*
 497 F.3d 615 (6th Cir. 2007) ..................................................................... 26

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...............................................................................6

## CONSTITUTIONS

California Constitution, Article I, § 1 ....................................................................32

USCS Const. Amend. 26, § 1 ........................................................................31, 40

## STATUTES AND RULES

8 U.S.C.S. § 1255 .................................................................................................48

15 U.S.C. §§ 6501-08 ...........................................................7, 47, 48, 49, 56

15 U.S.C.S. § 6501 ...............................................................................................48

15 U.S.C.S. § 6502(a) ..........................................................................................48

15 U.S.C.S. § 6502(d) ..........................................................................................48

15 U.S.C.S. § 4401 .........................................................................................31, 40

18 U.S.C.S. § 3509 .........................................................................................48, 49

23 U.S.C.S. § 158 ..........................................................................................31, 40

28 U.S.C. § 1291 ...................................................................................................6

28 U.S.C. § 1332(d) .........................................................................................6, 13

28 U.S.C. § 1446 ..................................................................................................13

28 U.S.C. § 1453(b) .............................................................................................13

42 U.S.C.S. § 1382c .............................................................................................48

42 U.S.C.S. § 1779e .............................................................................................48

Business & Professions Code § 16700 *et seq* ....................................................54

Business & Professions Code § 17200 *et seq* ..................................1, 5, 14, 29, 51

California Civil Code § 654 ..............................................................................43, 45

California Civil Code § 663 ...................................................................................43

California Civil Code § 3344 .........................................................................*passim*

California Civil Code § 3344(a) .......................................................................18, 39

California Code of Civil Procedure § 680.290 ......................................................43

California Family Code § 6701...............................................................................41

California Family Code § 6701(a) ...............................................................41, 42, 43

California Family Code § 6701(c) ....................................................18, 43, 44, 45, 46

California Family Code § 6710...............................................................................41

California Family Code §§ 6750 *et seq* ................................................................46

California Family Code § 6752...............................................................................46

California Family Code § 6752(b)(2) .....................................................................46

California Penal Code § 261.5 .........................................................................31, 40

California Penal Code § 653 ............................................................................31, 40

Fed. R. Civ. P. 12 ......................................................................................................3

Fed. R. Civ. P. 12(b)(6).........................................................................................14

Fed. R. Civ. P. 23(c)(5)..........................................................................................27

Fed. R. Civ. P. 23(e)........................................................................................19, 20

Fed. R. Civ. P. 23(g)...............................................................................................26

## OTHER AUTHORITIES

*Judges! Stop Deferring to Class Action Lawyers*,
    2 U. Mich. J.L. Reform 80-90 (2013)...............................................................38

## INTRODUCTION

This is a class action affecting hundreds of millions of current and future Facebook subscribers.   The case was brought by Plaintiffs primarily to protect subscribers' rights of privacy, citing only California Civil Code § 3344 and violations of California's Unfair Competition Law, Business & Professions Code § 17200 *et seq.*  In addition to the class of Facebook subscribers is a subclass of children (teens from 13 to 18) who are Facebook subscribers.  The class and subclass were provisionally certified by the District Court as a class for settlement purposes only -- without notice to class members, nor contested litigation concerning commonality (or subclass conflicts with the class), qualification of representatives or counsel, or other prerequisites to class certification. (Preliminary Approval of Class Settlement and Provisional Class Certification Order filed December 3, 2012, ("Preliminary Approval Order") at 2, Excerpts of Record ("ER") 278.)

At the heart of the Appellants' objection to the settlement is the District Court's approval of Facebook's "blanket waiver" in a lengthy "terms and conditions" routinely checked off, that purports to constitute automatic thereafter consent to the expropriation of Plaintiffs' names, photographs, likenesses, and identities, to rearrange for transmission to other subscribers.  Presently, the alleged consent is channeled into the Sponsored Stories program (or a similar differently

named program) that uses the postings to advertise products, services, or brands for a commercial purpose without Plaintiffs' consent, and with compensation only to Facebook. Importantly, this categorical advance consent is to be applied to the 13-to-18 year old child subclass. And this new blanket waiver additionally includes the alleged representation that the parents of these children know about this waiver and join in it. In fact, the waiver functionally means that neither the children nor their parents will know when Facebook extracts teen postings, what the republication will include, or to whom it will be sent.

Appellants respectfully request this Honorable Court read the two paragraphs in bold reproduced in the Statement of the Case, *infra*. This is the exact language to be added to the "check the box" form and is the *res gestae* of Appellants' objection. As the new language itself reveals, the waiver in those new terms and conditions paragraphs extends well beyond the Sponsored Stories type of use. Its breadth has unclear, troubling boundaries. The "you all opt in unless you somehow manage to opt out" format is undertaken to assure Facebook of maximum inclusion and revenue – now exceeding $200 million per year from the current Sponsored Stories program. The purported exceptions and limitations will not apply to the vast majority of teen children subject to this intervention, capture, selection, and republication.

Appellants, members of the subclass of children, objected to the Settlement Agreement on the basis that it fails to meet the applicable test of "fair, reasonable, adequate," and is not free from collusion. Further, this case involved a combination of troubling features commending close judicial scrutiny, including the following:

(a) As noted above, the proposed settlement was reached before the class was certified or class representatives and counsel were found to be adequate under FRCP 12, or of commonality and conflict problems between the class and the minor subclass, questions of particular import here;

(b) The lack of experience of Plaintiffs' counsel in the relevant subject matter and in advocating on behalf of the unique subclass of children involved;

(c) The absence of many relevant arguments and statutory and constitutional infirmities in the proposed settlement by class counsel – particularly on behalf of the subclass of children, and in fact the child class counsel's open repudiation of his own clients' consent rights;

(d) The incentive of millions of dollars in assured attorney fees (between $7.5 million and $10 million), while the District Court later (after class agreement with these substantive terms) reduced to $4.5 million further indicating its excessive level at the point of plaintiff class agreement with Facebook's terms for settlement; and

(e) The apparently unique circumstance that California Civil Code § 3344 includes a "reverse fee shift provision" that was used by Facebook counsel to threaten repeatedly in depositions that plaintiffs would owe the massive fees and costs incurred by Facebook if they did not accept its settlement terms and plaintiffs then lost the underlying case. That is, we have here the open, repeated threat of serious cost assessment to plaintiff class counsel and possible financial ruination to each of the minor subclass representatives. This last element creates a "forced collusion" element that is extraordinary and has implications.

Plaintiffs' counsel, the Settlement Agreement, and the District Court all failed to meaningfully take into account the unique features of adolescents that compel special consideration and which render the terms of the Settlement Agreement inadequate, unfair, and unreasonable *vis-à-vis* the subclass of children.

In sum, Appellants are not challenging the Settlement Agreement because it is not "as robust as some would prefer," as the District Court dismissively characterized Appellants' arguments. (Order Granting Motion for Final Approval of Settlement Agreement ("Final Approval Order") at 9, ER 13.) Instead, Appellants note that Facebook concedes in its Rights and Responsibilities that California law applies (Second Amended Class Action Complaint ("Second Amended Complaint") ¶ 48, ER 516.) Accordingly, Appellants challenge: (a) the inappropriate level of deference paid to the Settlement Agreement by the District

4

Court given the circumstances of the case listed above; (b) the *per se* violation of applicable California law on the capacity of minors to contract; (c) the violation of explicit California statutes requiring affirmative parental consent and assuring privacy rights; (d) the breach of applicable constitutional principles; and (e) the *per se* violation of federal antitrust law regarding "tie-ins". None of the applicable statutes, common law and constitutional jurisprudence – few of which were even raised by class counsel – allows the inurement of privacy incursion, and consent assumption, to a commercial third party.

By allowing the violation of these applicable statutes and constitutional principles, the Settlement Agreement does a disservice to the subclass of children and leaves them more vulnerable to harm than before Plaintiffs filed their underlying action. Far from being "fair, reasonable and adequate," the approved "advance blanket waiver" constitutes a *per se* violation of applicable law. It moves the subclass of children in a negative direction, more disadvantageous for them than was the *status quo ante* before the litigation was filed.

## STATEMENT OF JURISDICTION

This case originated with a complaint filed in Santa Clara County Superior Court by Plaintiffs to protect their rights of privacy under California Civil Code § 3344 and California's Unfair Competition Law, Business & Professions Code § 17200 *et al.* Defendant Facebook successfully had the case removed to U.S.

5

District Court for the Northern District of California pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332 (d).  (Notice of Removal, ER 553-556.)

Over Appellants' objection, the District Court entered an Order Granting Motion for Final Approval of Settlement on August, 26, 2013.  (ER 5-18.) Appellants timely filed a Notice of Appeal on September 24, 2013.  (ER 32-33.) *See* Fed. R. App. P. 4.  Appellate jurisdiction exists under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

A district court's determination that a settlement in a class action lawsuit is fair, reasonable, and adequate, is reviewed for abuse of discretion.  *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1028 (9th Cir. 1998); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995).  To survive appellate review, the district court must show it has explored comprehensively all factors. *Hanlon v. Chrysler Corp., supra* at 1026.   However, to the extent a district court's decision rests on a flawed interpretation of the law, the standard of review is *de novo*. See *Omega Eng'g, Inc. v. Omega*, 432 F.3d 437, 443 (2d Cir. 2005); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 106 n.12 (2d Cir. 2005).

## STATEMENT OF ISSUES PRESENTED

Appellants respectfully present two primary issues and an important sub-issue to this Honorable Court.

First, what is the appropriate level of deference to be paid by the court to the settling parties when approving a settlement agreement in a class action case where the settlement class has only been provisionally certified, where *bona fide* objections to the settlement are presented (including objections by the lead named Plaintiff (Fraley) and even by designated *cy pres* recipients), and where there exists a threat of personal bankruptcy for the named plaintiffs and a potential financial windfall for the settling attorneys?

Second, can a settlement be approved by a district court as fair, reasonable, and adequate when it purports to waive rights given to children by California statutes (that Facebook concedes fully apply to its operations)? How can such a settlement be approved when it allows an advance blanket waiver that contravenes the specific privacy and consent rights of children and their parents under applicable law? How can it stand when it baldly violates federal and state statutes and constitutional provisions, including California Civil Code and Family Code provisions, the California Constitution embodying its specific "Privacy Initiative," federal antitrust law, and the U.S. Constitution's "fundamental liberty interest" to parent, as discussed below in detail?

An important part of this order of approval is the sub-issue of the application of the federal Children's Online Privacy Protection Act (COPPA) (15 U.S.C. §§ 6501-08), an act which creates a very high level of protection for children **under**

7

the age of 13 who are using the Internet.  Facebook, with the favorable reference in the District Court's final order, contends that this federal law preempts and voids all state laws everywhere pertaining to the privacy protection of all children, including the teens aged 13-18 who are explicitly **excluded** from that statute *en toto*.   The cited basis for preemption is a superior court class action early dismissal that is not precedential and is misleadingly described, see *infra*.

## STATEMENT OF THE CASE

### A.  Facts Relevant to the Issues Submitted for Review

Facebook is a web-based social networking site with over 150 million subscribers in the United States. (Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("Order re MTD") at 1, ER 429.) Members join Facebook.com for free; however, Facebook generates its revenue through the sale of advertising from a number of programs targeted at its users. (*Id.*)  One of these many and varied revenue mechanisms has been the "Sponsored Stories" practice. A Sponsored Story is one advertising strategy utilized by Facebook, which may be generated whenever a member utilizes the Post, Like, or Check-in features, or uses an application or plays a game that integrates with the Facebook website, and the content relates to an advertiser in some way determined by Facebook. (Order re MTD at 3, ER 431.) When this lawsuit was filed, Sponsored Stories were enabled for all users, including teen children.  (*Id.*)

8

The nature of the Internet poses unique dangers to children. Children lack maturity, which may lead to ill-considered decisions. If a child posts regretted information, it is commonly accessible for years. (Objection and Notice of Intention to appear filed May 1, 2013 ("Depot Objection") at 8, ER 215.) The information can also be retransmitted by others to even larger audiences.  Children may not have the maturity to comprehend this reality and its implications. This immaturity is demonstrated in recent studies which found that children do not always know individuals prior to accepting a "friend" request. Studies show that more than two-thirds of teens confess that they have accepted such a Facebook "friend" request from persons they did not know, and nearly one in ten teens admit to accepting all "friend" requests they receive. (*Id.*)  Moreover, the retransmission allowed in this settlement is not necessarily confined to those designated as "friends," but may well be released to the default audience for postings: "the general public."

The proposed settlement class in this action consists of 150 million members of Facebook, Inc.'s eponymous social network website, whose names and/or likenesses allegedly were misappropriated to promote products and services through Facebook's "Sponsored Stories" program. (Final Approval Order at 1, ER 5.) Information available as of August 31, 2012 indicated that Sponsored Stories had generated total revenue of more than $230 million. (Plaintiffs' Motion and

9

Memorandum of Law in Support of Motion for Attorneys' Fees and Costs and

Class Representatives' Service Awards at 17, ER 275.) Approximately 10.9

million members of the settlement class are children. (Plaintiff's Memorandum of

Law in Support of Motion for Class Certification, Appointment of Class Counsel,

and Appointment of Class Representatives at 11, ER 151.)

       Under the terms of the approved Settlement Agreement, Facebook would be

allowed to amend its Statement of Rights and Responsibilities (its new name for

"terms and conditions") from the following agreement: "You can use your privacy

settings to limit how your name and [Facebook] profile picture may be associated

with commercial, sponsored or related content (such as a brand you like) served or

enhanced by us. You give us permission to use your name and [Facebook] profile

picture in connection with that content, subject to the limits you place." (Second

Amended Complaint, at 9, *citing* § 10.1 of Facebook's "Statement of Rights and

Responsibilities", ER 513.) As altered, it would include now the following

statement:

> **You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information. If you have selected a specific audience for your content or information, we will respect your choice when we use it.**

**If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.** (Amended Settlement Agreement and Release ¶ 2.1(a), ER 299.)

Although the second paragraph is limited to users under the age of majority, the first paragraph applies to all Facebook users. Thus, in addition to "representing" that children agree to whatever Facebook wants to do with the child's name, image, content, and information, the child represents that he has the consent of his/her parent. Both emanate from the above paragraph within a long "Rights and Responsibilities" (formerly and usually called a "terms and conditions" set of provisions) for clicked check-off . This purported consent vehicle is normally only presented at initial point of subscription.

As to the consent of the 10 million plus current teen subscribers, it will be effective simply by a notice by Facebook that the "Rights and Responsibilities" terms have been altered – without quoting the above graphs in bold or meaningfully explaining what changes have occurred. Continued use after that "notice" will effectuate the blanket consent from children to capture and transmit their posts or photos as Facebook selects without prior notice of what is to be transmitted or to whom, including supposedly conclusive attestation that parents have consented.

The terms of the proposed Settlement Agreement state that Facebook will "encourage new users, upon or soon after joining Facebook, to include in their profile information their family, including their parents and children. Where both a parent and a minor child are users and confirm their relationship, Facebook's systems will record this relationship and utilize it to provide parental controls and parental educational information. (Amended Settlement Agreement and Release ¶§2.1 (c)(i)-(iii), ER 300.)

The Agreement continues: "Facebook will add a control in minor users' profiles that *enables* each minor user to indicate that his or her parents are *not* Facebook users. Where a minor user indicates that his or her parents are not on Facebook, Facebook will make the minor ineligible to appear in Sponsored Stories until he or she reaches the age of 18." Where one of the few minors so responding confirms that parents are Facebook subscribers, the parent is then "able" to opt his child from Sponsored Stories. (Amended Settlement Agreement and Release ¶§2.1 (c)(iii), ER 300 (emphasis added).) There is nothing in the Settlement Agreement to require parental notice nor consent to the blanket waiver of all future notice/consent rights. There is utterly no advance notice of actual content seized nor knowledge of its destination. In other words, these "limitations" or "exceptions" are disingenuous fig leaves. There is no real or lawful child or parental consent. The notion that where Facebook knows or learns there is a parent

subscriber, that such a parent may somehow figure out that he or she can object to the blanket waiver is not a *bona fide* anything. Once again, neither the child nor any parent will necessarily nor even likely see what is being captured and how it will appear and to whom it will be sent. And neither will ever see it before it is sent. And once sent, it is there for many years, without a chance for retraction or qualification. The arrangement is a convoluted and bad faith "required opt out" "in the blind" arrangement. And the vast majority of millions of Facebook-subscribing children, as Facebook well knows, will be subject to the open season of blanket waiver, and parents will, in fact, know nothing about any of this.

### B. Relevant Procedural History

On March 11, 2011, plaintiff Angel Fraley and her co-Plaintiffs ("Plaintiffs") filed a class action lawsuit against Facebook in the Superior Court of the State of California in and for the County of Santa Clara, entitled "*Angel Fraley, Paul Wang, and Susan Mainzer, individually and on behalf of all others similarly situated v. Facebook, Inc., a corporation, and DOES 1-100*", with case number 111CV196193. (Notice of Removal of Action Under 28 U.S.C. §§ 1332(d), 1446, and 1453(b) ("Notice of Removal"), at 2, ER 554.) On March 18, 2011, Plaintiffs filed their First Amended Complaint in Santa Clara County Superior Court. (Notice of Removal at 1, ER 553.)

13

Facebook removed the case to the U.S. District Court for the Northern District of California (ER 550-552), where it was assigned to Judge Lucy H. Koh (ER 549).

On June 6, 2011, Plaintiffs filed their Second Amended Class Action for Damages. (ER 505-548.) On July 1, 2011, Facebook filed a motion to dismiss the Second Amended Class Action Complaint. (ER 471-504.) On December 16, 2011, Judge Koh granted in part and denied in part Facebook's motion. (ER 429-466.) Although granting Defendant's Rule 12(b)(6) motion to dismiss Plaintiff's claim for unjust enrichment, **Judge Koh *denied* Defendant's motion to dismiss the complaint based on lack of Article III standing, immunity under § 230 of the federal Communications Decency Act, failure to state a claim under California Civil Code § 3344, and failure to state a claim under the Unfair Competition Law**. (Order re MTD at 37-38, ER 465-466.)

On March 29, 2012, Plaintiffs filed a Notice of Motion and Motion for Class Certification; the hearing on the motion was set for May 24, 2012. (ER 425.)

On May 21, 2012, the court filed a Case Management Order indicating that "the parties represented that they have reached a settlement agreement in principle." (ER 424.) The court subsequently scheduled and continued the hearing on Plaintiffs' Motion for Class Certification to July 12, 2012, and stated that the July 12, 2012 hearing on Plaintiffs' motion for class certification "will be

converted to a hearing on the motion for preliminary approval." (Order Re: Joint Status Update, ER 422)

On June 20, 2012, Plaintiffs filed a Motion for Preliminary Approval of Class Action Settlement. (ER 377-421.) It called for Facebook to make limited changes to the Statement of Rights and Responsibilities as to Sponsored Stories (such as they are, discussed above), and contemplates Facebook making a *cy pres* payment of $10 million to certain organizations involved in Internet privacy issues. It also provides that Plaintiffs may **apply for an attorney fee award of up to $10 million, without objection by Facebook** (*see* Order Denying Motion for Preliminary Approval of Settlement Agreement, Without Prejudice, ("Order Denying Mot for Prelm Settlement Approval") at 1, ER 367.) At this point, the litigation has been in progress almost exactly one year.

On July 11, 2012, Judge Koh recused herself from the case and ordered that all "pending dates of motions, pretrial conferences, and trial are hereby vacated" and on July 12, 2012, the case was re-assigned to Judge Richard G. Seeborg, who rescheduled the hearing on the Motion for Preliminary Approval to August 2, 2012. (*See* Clerk's Notice, ER 375.)

On August 2, 2012, Judge Seeborg heard the Motion for Preliminary Approval and on August 17, 2012, he denied it. (Order Denying Mot for Prelim Settlement Approval, ER 367-374.) Judge Seeborg preliminarily questioned the

propriety of a settlement that provides no monetary relief directly to class members (Order Denying Mot for Prelim Settlement Approval at 2-4, ER 368-370); the amount of the *cy pres* payment (*id.* at 4, ER 370); the injunctive relief and, specifically, Facebook's ability to obtain valid consent from minors (*id.* at 6,ER 372); the amount of attorney fees (*id.*); and other issues (*id.* at 8, ER 374).

On October 5, 2012, the parties filed a Joint Motion for Preliminary Approval of Revised Settlement. (ER 290-293.) The revised settlement provided for a $20 million settlement fund, from which Class Members may make claims to receive a cash payment of up to $10 each; provided that Facebook may oppose Plaintiffs' counsel's petition for fees and expenses; purported to provide a greater level of detail regarding how the injunctive relief will be implemented as to all class members and purported to augment the relief related to the child users; and provided that after payment of all claims, fees, and administrative expenses, any remaining portion of the $20 million will be awarded as *cy pres* to organizations proposed by the parties and approved by the Court. (*Id.* at 1, ER 290.)

A hearing was held on Nov. 15, 2012 (*see* Order Granting Joint Administrative Motion for Relief, ER 284-285) and on Dec. 3, 2012, Judge Seeborg issued an order granting preliminary approval of the class action settlement and provisional class certification (Preliminary Approval Order, ER 276-283). On May 1, 2013, Michael S. Depot, as *Guardian Ad Litem* for his

16

children, K.D. and C.D., filed an Objection and Notice of Intention to Appeal

(ER 203-252), on the bases that the preliminarily approved settlement does not

adequately consider the unique needs of the subclass of children, that it sanctions

the violation of state law and other protections related to children, and that class

counsel lacked adequate experience to protect the unique interests of the subclass

of children, *et al.*.

On August 26, 2013, Judge Seeborg granted the motion for final approval of

the settlement agreement. (ER 5-18.)  Objector Depot filed a notice of appeal on

September 24, 2013.  (ER 32-33.)

### C. Rulings Presented for Review

The rulings presented for review are those set forth by the District Court in

its Order Granting the Motion for Final Approval of Settlement Agreement (ER 5-

18), specifically that the settlement agreement is fair, reasonable and adequate; that

the agreement adequately protects the interests of the minor subclass; that

California statutes are "unavailing" and not "implicated by the circumstances here"

(Final Approval Order, at 13, note 14, ER 17); and that the District Court exercised

the appropriate amount of inquiry into the terms of the settlement agreement given

the posture of the case.

## SUMMARY OF ARGUMENT

The District Court abused its discretion by not providing a rigorous review of the Settlement Agreement, and by not applying the higher standard of fairness and adequacy compelled under these facts. That duty is enhanced where a settlement agreement is negotiated before the class is even certified, and will impose its result on a class of more than 150 million and a subclass of more than 10 million children.

That enhanced standard of review is reinforced where there are unique factors influencing the settlement. Among these is the fact that the plaintiff class was dealing with a "fee shift reversal" – to assess each class representative and counsel a bill (reasonably perceived to be millions of dollars) – that Defendant Facebook repeatedly threatened if its terms were not accepted and the Plaintiffs were not to prevail on the Civil Code § 3344 claim. .

Further, a settlement that authorizes the continuation of illegal conduct cannot be found to be fair, reasonable, and adequate. The District Court erred as a matter of law in approving a Settlement Agreement that would permit the violation of state statutes and constitutional law, including California Civil Code § 3344(a) and Family Code §§6701(a), and 6701(c), among others. It also violates California's "privacy initiative" ensconced in the state Constitution. It interferes with the federally recognized "fundamental liberty interest of the right to parent."

And it would permit an ongoing *per se* "tie-in" antitrust violation prohibited under state and federal law.

## ARGUMENT

**I.  Given the Posture of this Case, the District Court Properly Plays an Active Role in Determining Whether a Settlement Agreement is Fair, Reasonable, and Adequate.**

A court must review a settlement agreement for overall fairness, and needs to show it has explored all of the factors *comprehensively* for fairness, reasonableness and adequacy.  *See Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1026 (9th Cir. 1998).  *See also Grunin v. Int'l House of Pancakes* 513 F.2ds 114, 124 (8th Cir. 1975) (finding that, when evaluating the approval of a settlement agreement, the court must apply a "reasonableness under the totality of the circumstances" standard).  The Third Circuit Court of Appeals has laid out a nine-factor test to help district courts analyze whether settlements are fair, reasonable, and adequate as required by Rule 23(e).  *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975).  Those factors are:  (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best

recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Id.*

In cases where settlement agreements are negotiated before formal class certification, "settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.,* 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotation marks omitted). Additionally, the posture of the parties, as discussed below, requires the court to play a more active role in assuring that the settlement the parties have negotiated (a settlement which may be beneficial to the named plaintiffs, their attorneys, and the defendants) is also beneficial to the millions that will be bound to its terms. *See In re Beef Industry Antitrust Litigation* 607 F.2d 167 at 174 (5th Cir. 1979) (explaining that some treatises point to the court's important role in preventing "collusion, individual settlements, 'buy-offs' where the class action is used to benefit some individuals at the expense of absent members, and other abuses" when evaluating a class action settlement before the class has been properly certified).

The posture of this case does not commend the usual deference to trial proceedings. The issues here are not findings of fact; none have been litigated. This Honorable Circuit has the same information as did the District Court. Although this was not a typical case or settlement, the District Court assumed

a candidly deferential role.  The Court stated his "**only role** in reviewing the

substance of (that) settlement is to ensure that it is "fair, adequate, and free from

collusion." (Final Approval Order at 3, ER 7, emphasis added.)

Indeed, at the June 28, 2013 hearing on the Settlement, the District Court

reiterated his *laissez faire* approach.  In response to arguments offered by the

Appellants that the proposed settlement did not adequately protect the rights of the

subclass of teen children, the District Court stated:

> My function here is not to craft the perfect policy for minors.
> That's not what I'm entitled to do.  What I am to do here is to
> determine whether or not this particular settlement ...is fair,
> reasonable and adequate.  Not could I craft a better policy?  That is
> not the – that isn't the world in which I operate.
> So when you are making your arguments, to the extent that the
> argument is 'Boy, there's a better way do this," that really doesn't go
> to the – the function that I have to engage in at the moment.
> It really is, this – this particular remedy is valueless, it's not
> fair, it's not reasonable.  I mean, adequate, there, you may be closer to
> it, in terms of what you are arguing.  But, just to keep in mind, it is not
> 'Can this be done with more protection for a minor,' because I am not
> in a position to craft it.  I am here to either accept or reject.

(Reporter's Transcript of Proceedings in U.S. District Court, Northern District of
California, before the Honorable Richard G. Seeborg on June 28, 2013
("Reporter's Transcript") at 62, ER 47.)

Appellants agree with the District Court that his role is not to impose

optimum terms.  But where the terms provide no discernible benefit for a subclass

of children, and instead constitute a negative *vis-à-vis* the *status quo ante*, such a

posture commends a more critical examination, particularly where the *per se*

violation of statutory offenses is implicated.

Appellants understand the considerations that commend deference to parties

who have agreed on a resolution. That is what praiseworthy attorneys accomplish.

Some depositions and initial motions have occurred. It is complicated. It is now

common to have many reflexive objectors – even as to very meritorious

settlements.[1] But such deference is less commended where the postings of millions

of children may be expropriated by a commercial third party, and in the

extraordinary circumstances outlined below.

Whatever deference may be due does not preclude a court from holding that

to be fair, reasonable, and adequate, the republication of child postings by

Facebook must have adequate safeguards to comply with applicable law.

Appellants offered one of many possible means to so comply (copy and paste what

was to be captured and sent, and to whom, with a "consent" button for teens and

their parents). That is an easy "opt in" method that complies with the law. But

any number of options are available to accomplish such actual consent. Appellants

hardly expect the court to draft such a provision — but some mechanism to

---

[1] Indeed, the rise of sometime obstructionist and economically interested (or
compensation seeking) objectors has understandably undermined their credibility
and has created in many courts a marked sympathy for counsel who actually
have to litigate a case, often for years, and who have admirably resolved the matter
with some apparent benefit for many people.

provide some actual, knowing consent in order to comply with applicable law

is required.

That expectation is consistent with the recent ruling of this Honorable Court

in *In Re Bluetooth Headset Product Liability*, 654 F.3d 935 at 949 (9th Cir. 2011)

as to when remand should occur. As in *Bluetooth*, the instant District Court places

heavy weight on the reputation and independence of the assigned mediator. And

Appellants do not dispute the similarly stated opinion of the District Court as to

this mediator. But that role is limited. It normally does not involve inquiry into

the qualifications of class counsel, or review of deposition transcripts where

financial threats are made to class representatives. He is not an expert, nor does he

evaluate the evidence. He negotiates between contending counsel that he assumes

effectively represent all relevant interests.

### A. The Pre-Certification Stage of the Case Requires Greater Court Inquiry into the Settlement Agreement as Sufficiently Fair, Adequate and Reasonable.

As noted, some deference for an agreement between contesting parties is

expected. *See e.g., Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1027 (9th Cir. 1998)

(citing the "proper deference [given] to the private consensual decision of the

parties") and *Dennis v. Kellogg Co.,* 697 F.3d 858, 864 (9th Cir. 2012). In most

cases, counsel has a fiduciary duty to their clients and to nobody else, and

their clients represent the contending interests before the court. Accordingly,

a stipulated judgment is usually entitled to respect -- as the attorneys do not expend the resources of clients and of the court and public, but instead professionally measure the merits of their respective cases and reach a resolution consistent with what would have been a litigated result.

However, "where, as here, class counsel negotiates a settlement agreement before the class is even certified, courts 'must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.' In such a case, settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).' 'To survive appellate review, the district court must show it has explored comprehensively all factors,' and must give 'a reasoned response' to all non-frivolous objections." *Dennis v. Kellogg Co*., 697 F.3d 858, 864 (9th Cir. 2012), citing *In re Bluetooth Headset Prods. Liab. Litig.,* (9th Cir. 2011) 654 F.3d 935, 947 (9th Cir. 2011) (additional internal citations omitted).

Indeed, the District Court noted in his Order Granting Motion for Final Approval of Settlement Agreement, "when (as here) the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness.' More exacting review of class settlement reached before formal class certification ensures that class representatives and their counsel do not secure

disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" (Final Approval Order at 3, ER 7.) The rationale for that added level of inquiry is magnified where there is a very large class of persons to be affected by a judgment. In contrast to such inquiry, the District Court begins his discussion in the final Order of Approval with the note that "[t]his settlement was achieved through negotiations mediated by a renowned retired federal magistrate judge following **months** of active, adversarial, litigation." (*Id.,* emphasis added.) The Court adds that "[t]here is no basis to conclude that the negotiations were based on anything other than a good faith, arms-length attempt by experienced and informed counsel to resolve the matter through compromise. As such the settlement is entitled to a degree of deference as the private consensual decision of the parties." (*Id*.)

Apparent "active, adversarial, litigation" alone should not end the inquiry. While, "[o]rdinarily, a court relies on class status, particularly the adequacy or representation required to maintain it, to infer that the settlement was the product of arm's length negotiations…[w]here the court has not yet certified a class or named its representative or counsel, this assumption is questionable." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.* 55 F.3d 768, 787-788 (3d Cir. 1995) (internal citations omitted).

The U.S. Seventh Circuit Court of Appeals has noted "the danger of a premature, even a collusive, settlement [is] increased when as in this case the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates." *Mars Steel v. Continental Illinois Nat'l bank & Trust,* 834 F.2d 677, 680 (7th Cir. 1987). There has been little testing of that representation. The importance of that missing step is underlined when the class to be bound or affected by the settlement includes many millions of American teen children and their parents who are unlikely to even view these "terms and conditions" post subscription, (even less so than the new subscribers).

Related to the issues above, is the separate and specific obligation to evaluate the adequacy of class counsel. Federal Rule of Civil Procedure 23(g) sets out a list of factors a court must consider in that task, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and complex litigation, **and the types of claims asserted in the action**; (iii) counsel's **knowledge of the applicable law**, and (iv) the resources that counsel will commit to representing the class. Fed R. Civ. P. 23(g) (emphasis added). Lead counsel for the class is the competent small law firm of Robert Arns. The appropriateness of its position as subclass counsel for children has not been tested. The historical focus of that firm

has been class personal injury cases. In some cases its clients necessarily include children. However, it does not have experience representing children who, because of their minority, have unique interests to be protected – as in the instant case. (*Compare with, UAW v. GMC,* 497 F.3d 615, 626 (6th Cir. 2007) (attorney was well qualified to represent class in retiree healthcare class action when he had practiced labor law for almost 24 years and had litigated almost 50 similar class actions).)

This is a case involving many millions of children, Internet practices, and privacy law. It is a different landscape than the typical personal injury case for involved children here. As an example in contrast, Appellants along with their instant counsel offered to intervene on behalf of the subclass – including the entry of class representatives and counsel as an alternative to the subclass representation now extant.[2] (Depot Objection at 4, FN 1, ER 211.)   Appellants respectfully believe that their counsel have substantially more experience in the representation

---

[2] Our offer was ignored. However, note that federal caselaw interpreting FRCP 23(c)(5) requires separate counsel where the interests of the subclass conflict with the class. (*In re Literary Rights* 654 F.3d 242 (2nd Cir. 2011), citing *Central Sales v. Merck-Medco* 504 F.3d 229 (2nd Cir. 2007); see also *Ortiz v. Fibreboard Corp.* 527 U.S. 815 (1999).)  In this case the subclass of children has obvious separate privacy vulnerability at issue and have an interest quite distinct from adults. The latter may well be interested in payment and do not care about what minors do; the former have a phalanx of protective statutes, common law precedents, and constitutional rights that are distinct and significant.

of children and in privacy issues.[3]  Given the status of the settlement as "pre

certification", *i.e.* prior to any consideration or decision as to the adequacy of class

representatives or counsel, that offer might have been entertained, but was not.

The importance of effective representation of the subclass of children was

underlined in the oral argument of the instant case before the District Court.

A *bona fide* child advocate of the teen child subclass might have recognized the

disparate legal status of children in settlement terms.  Instead, counsel for the

subclass of children (also serving as counsel for the entire class) actually argued

*contra*.  For example, counsel for the subclass of children contended that

continued use of Facebook as a social media service provides "implied consent" to

the blanket expropriation of their posts for commercial endorsements in the revised

"rights and responsibilities" check-off term that the settlement approves.   Ignoring

the fact that minors lack capacity, he argues: "We have the implied consent

situation as well as the actual consent.... teenagers do not want to leave

Facebook.... They continue to use it, continue to commit the social actions which

create the sponsored stories, they are going to see every one they are in."

(Reporter's Transcript at 23, ER 43.)   In fact, the teens are not necessarily going to

---

[3] Instant counsel is the law firm of the Center for Public Interest Law (CPIL) and the Children's Advocacy Institute (CAI).  CPIL is one of the progenitors of the Privacy Rights Clearinghouse – a longstanding national advocate for privacy rights.   CAI has represented children in California and nationally for 23 years and has been involved in the governance of the National Association of Counsel for Children, and other organizations.

see the use of their postings, will not know who received them, and neither they nor their parents will have any chance to review and consent to any of it prior to its effectively intractable dissemination.   And how does continued use of a social networking service (so advertised and sold) constitute "implied consent" to participate in a separate commercial endorsement market?  Commercial endorsements are not what Facebook sold or sells, it rather offers a social networking site.  As discussed below, the tying together of these two different service markets raises the issue of a serious and unexamined *per se* antitrust offense.  But in addition, how does continued use of one type of service (social networking) constitute consent to purchase a disparate service (commercial endorsement service market) about which the buyer knows little and is told less?  And how does a simple notice that the Rights and Responsibilities terms have changed in some unspecified manner constitute actual consent anyway?   (Note also that for most it was not even called that, but "terms and conditions" upon subscription.)

The Plaintiff class' case below focuses on a single section of California law (Civ. Code § 3344), the state's Unfair Competition  Law, and unjust enrichment – all with an eye toward a fund from which fees may be justified.  Ignored with particular gravity for the subclass of children are the Family Code sections discussed below, the antitrust tie-in offense and even the California Constitution's

29

explicit right to privacy. All are highly relevant because Facebook concedes in their Rights and Responsibilities statement that California Law applies to its operations. (Second Amended Complaint ¶ 48, ER 516-517.)

Those questions are properly addressed — and illustrate the need to have class counsel familiar with child-related law. For example, how is such consent implied as to minors who lack legal capacity to contract? And how is it enforceable when specific state statutes do not allow third-party expropriation of a child's property? Further troubling this settlement is the "law of the case" ruling by District Court Judge Koh initially judging that numerous contentions, including the child privacy statute cited above and unfair competition law allegations, stated facially viable causes of action. (Order re MTD, ER 429-466.)

Even the one California statutory violation concerning children that was raised by class counsel (*i.e*., Civil Code § 3344) was abandoned in order to sign the subclass of child clients onto this settlement. Ironically, it is not Facebook's counsel who makes the argument to undermine such protections. Class counsel affirmatively argues: "And the point is, this group 13 to 17 (sic), an extremely intelligent group. Yes, there is going to be some immature minors that are going to do stupid things on Facebook. That's not the issue in this case. There's a lot of immature adults who do stupid things on Facebook." (Reporter's Transcript at 25, ER 44.) Their own counsel denies their special status that precludes everything

from voting (USCS Const. Amend. 26, § 1) to smoking (15 USCS § 4401), to

consumption of liquor (23 USCS § 158), tattoos (Cal. Pen. Code § 653), even sex

(Cal. Pen. Code § 261.5)[4] .   This is all rebutted because these teens are "an

extremely intelligent group."   But it had the intended effect on the District Court,

who noted "... how is it any different between an adult and a 13 to 17 year old, in

terms of using their likeness for purposes of, in this instance, sponsored stories?"

(Reporter's Transcript at 51, ER 45.)  And when we cited the need to differentiate

children, the Court dismissed our concerns by noting: "… the premise [that] they

post things without thought is certainly not confined to minors..."  (*Id.*at 59, ER

46.)  The Court did not appropriately consider the rather relevant differentiation of

children under the law and how this settlement impacts them, a lack of distinction

disturbingly replicated by the very attorney serving as their fiduciary.[5]

    Certainly a decision by plaintiff or defense counsel to surrender claims in

a settlement may well be justified by a *bona fide* prospect of loss.  And of course

class counsels' claims may not survive trial, notwithstanding a judicial decision

here by Judge Koh that causes of action were stated in the pleading.  But what is

---

[4] Note that erasure from the internet of a Facebook republished entry may well
achieve a permanence of such a tattoo.  And unlike a hidden tattoo on the body,
may well be retransmitted, ranked high by Google when the child's name is
searched, and may well remain without effective means to erase – for many years.

[5] Another revealing indicator is class counsel's unilateral efforts to inhibit check
on the settlement, requesting an appeal bond fifteen times the costs actually
anticipated on appeal from each of the 18 objectors.  (*See* Depot's Opposition to
Plaintiffs' Motion for Posting of Appeal Bond by Objectors at 3, ER 24.)

less explainable are the numerous arguments of merit that were not even made (*e.g.*, the Family Code sections violated, the *per se* antitrust tie-in offense implicated by the practice of the fundamental liberty interest constitutional rights to parent, or the California Constitution's explicit grant of privacy rights in Article I, section 1). Most of these are very much at issue from the teen child class's perspective.

The initial settlement in this case involved the purported payment of $10 million in fees to class counsel (*See* Plaintiff's Motion for Preliminary Approval of Class Action Settlement ("Motion for Prelim Approval") at 8, ER 390.) Pursuant to the original settlement agreement, Facebook was not going to contest that amount. (Order Denying Mot for Prelim Settlement Approval at 1, ER 367.) Thus, the parties agreed that such compensation would be paid for a case then in litigation just over one year and prior to any decision regarding even class certification. Only after objections were received did class counsel lower its fee award claim to about $7.5 million in the final Facebook settlement terms it also supported. (*See* Order Granting in Part Motion for Attorney Fees, Costs, and Incentive Awards, at 2, ER 35.) Facebook belatedly included some *pro forma* objections at this point, but the level of award here to be received involved the calculation of fees close to $1,000 per hour for some class counsel, plus a multiplier. (*Id.*) This was the level in the final settlement proposal package and at

the point of class counsel concession and settlement court approval.  The final attorney fee approved by the court was *late*r lowered to "25% of the balance of the settlement funds remaining after deduction of (1) settlement administration expenses, (2) the costs awarded…and (3) the incentive awards made..."  (*Id*., at 6, ER 39.)   Whatever the merits, the final sum for the fees was approximately $4.5 million.  It is relevant that the disapproved higher numbers ($10, then $7.5 million) are the levels attending class counsel's agreement with Facebook as to these settlement terms applicable to minors.  While counsel was agreeing, first to the preliminary settlement agreement, and then to the final settlement terms, the sought and expected fees ranged from $10 million to $7.45 million – levels the District Court himself later found excessive.  (*Id.,* at 2-6, ER 35-39.)

While a court must review the settlement for overall fairness (*see Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998), "settlement classes create especially lucrative opportunities for putative class attorneys to generate fees for themselves without any effective monitoring by class members who have not yet been apprised of the pendency of the action."  *In re GMC*, 55 F.3d 768, 788 (3rd Cir. 1995).

### B. The Opinion of Class Members and *Cy Pres* Recipients that the Settlement Should not be Approved Commends Some Inquiry into it as Fair, Reasonable, and Adequate.

The opinion of the class representatives to the settlement has been appropriately considered an important factor to consider when determining the reasonableness of a settlement agreement. *E.g., Reed v. General Motors Corp,* 703 F.2d 170, 172 (5th Cir. 1983). Here, the lead class representative (Angel *Fraley*) objected to the settlement after withdrawing from this case, submitting a declaration that bluntly and clearly objected to the terms of settlement as inadequate (*see,* Objections to Brief re Order on Administrative Motion to File Under Seal, and to Preliminary Approval of Class Settlement and Provisional Class Certification Order, ER 152-154):

> We should have won the case instead of settling. I'd like to see how my name has been used in sponsored stories, which ones, and how much effect it had on my friends if determinable. I also would like to see [Facebook] explain clearly to its users about Sponsored stories, and give a clear option to back out or be paid for their name/face/reputation's use.[6]

In addition to the concerns raised by the named Plaintiffs, other class members have stepped forward to express their distaste for the Settlement

---

[6] This statement from Angel Fraley exists in stark contrast to her former attorney's representation (class counsel) to the District Court regarding her position on the Settlement Agreement. At the hearing regarding the Motion for Settlement held on June 28, 2013, Mr. Arns graciously offered to provide Angel Fraley with a portion of his attorney's fees but, in so doing stated that Ms. Fraley "supports the settlement" (Reporter's Transcript at 17, ER 41).

Agreement by filing objections in this matter. While some of these objections can be discounted as simply routine and without merit, some class members are true advocates for their class and the subclass of teen children. A remedy that *bona fide* advocates for the subclass of these children consider worse than what existed previously, might be a factor warranting critical review.

Finally, and more recently, Appellants have been informed that multiple *cy pres* recipients have or will publicly disavow their involvement and plan to refuse the funds. (*See* http://epic.org/2013/09/macarthur-foundation-withdraws.html and Letter from the Campaign for a Commercial Free Childhood ("CCFC"), dated February 12, 2014 filed with this Court in companion case number 13-16918, Docket Number 31, at p. 2 ("CCFC…has decided to reject the approximately $290,000 – more than 90% of CCFC's annual budget – that it anticipated receiving from this settlement as a *cy pres* recipient. After careful reflection and a deeper understanding of the settlement, CCFC now believes it was wrong to agree to serve as a *cy pres* recipient.").) We know of no other example of such principled declinations.

### C. The Repeated Threats by Facebook of Serious Personal Liability for the Teen Child Subclass Representatives if the Case Proceeds Warrants Special Attention as "Forced Collusion."

One of the most troubling aspects of this Settlement Agreement — and one which alone arguably should have required the District Court to play a much more

active role — is the extraordinary threat of financial sanction that all of the class representatives were under, including each of the teen child subclass representatives. The plaintiff class counsel informed the court, "In every one of [the] depositions, **including the minor depositions, Facebook asked the question: 'Do you understand that you are responsible for all the fees and costs that is [*sic*] being generated in the defense of this case?'** (Reporter's Transcript at 18,ER 42.)

This threat is based on the slender thread of California Civil Code § 3344 and its unusual "reverse fee shift" provision that may impose defense fees and costs on plaintiffs where the latter do not prevail. Even at one-half the fees here collected by class counsel, that assessment would mean literally millions of dollars in personal liability for class representatives (who stand to make only token incentive payments). Even as to class counsel, this circumstance can mean significant liability and reputation loss. (*see* Order Granting in Part Motion for Attorney Fees, Costs and Incentive Awards at 6, ER 39)) Bankruptcy and credit ruination of clients is not likely to stimulate future clients.

Clearly, the threatened risk of financial obligation weighed heavy on the mind of class counsel. At the hearing on the motion regarding settlement approval, lead class counsel, Mr. Arns, asked the court, "with Mr. Frank, with Mr. Fellmeth, would they be willing to take on this case, going back to 3344? Do they want to

36

put $20 million in trust?...Do they want to be subject to the 3344 fee and cost shifting, and take over the case?" (Reporter's Transcript at 98, ER 50.) And even if assessed against only the subclass representatives, the outcome of a case that involves not merely a failure to obtain a remedy for the class, but that may easily result in the bankruptcy and credit ruination of one's clients rather puts the *bona fides* of any such settlement in doubt.

Here, there is no true check on any potential wrongdoings by counsel because those who would provide the check – the named plaintiffs – are similarly placed in a position where only one outcome (settlement) assures they are not financially ruined. It is a situation that may properly be referred to as "forced collusion" – as the collusion is not voluntary but is forced upon the named plaintiffs due to one of the statutes under which relief was sought.

In order to appreciate the pattern of threats and intimidation by Facebook, we simply quote the request for admissions propounded on named Plaintiffs. We leave conclusions about its impact and import for this Honorable Court, without further comment.

> Admit that YOU are aware that if FACEBOOK is deemed the prevailing party in this lawsuit, the Court may find that YOU are legally obligated to satisfy, in whole or in part, a judgment awarding reasonable attorneys' fees and costs to FACEBOOK.

(Declaration of Jonathan M. Jaffe in Support of Motion for Attorneys' Fees and Costs and Class Representatives' Service Awards at 3, ER 274 (emphasis original).)

## II. The District Court Erred in Approving a Settlement That Violates Statutes and Constitutional Protections.

Courts have long recognized that "a settlement that authorizes the continuation of clearly illegal conduct cannot be approved." *Robertson v. Nat'l Basketball Ass'n,* 556 F.2d 682, 686 (2d Cir. 1977); *accord Isby v. Bayh,* 75 F.3d 1191, 1197 (7th Cir. 1996); *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123-24 (8th Cir. 1975). As discussed above, "a court must examine the totality of the circumstances and must determine, under that broad inquiry, whether the proposed settlement is fair, adequate, reasonable, *and legal." Brooks v. State Bd. of Elections,* 848 F. Supp. 1548, 1552 (S.D. Ga. 1994) (emphasis added); *see also id.* at 1577 (denying approval where "certain provisions…would violate Georgia statutory and constitutional law"; and *Officers for Justice v. Civil Service Comm'n* 688 F2d 615, 625 (9th Cir. 2011); *See also Judges! Stop Deferring to Class Action Lawyers*, 2 U. Mich. J.L. Reform 80-90 (2013). Because the proposed settlement here would "authorize the continuation of clearly illegal conduct," *Robertson,* 556 F.2d at 686, it is not appropriately affirmed.

## A. The Settlement "Blanket Waiver" Violates California Law.

California law controls the actions of Facebook and its users. (Second Amended Complaint ¶ 48, ER 516-517.) California Civil Code § 3344 provides in relevant part: "Any person who knowingly uses another's name, voice, signature, photograph or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting…, without such person's prior consent, or, in the case of a minor, the prior consent of his parent of legal guardian, shall be liable …". (California Civil Code § 3344(a).)

California courts have even held that this section "and common law rights of privacy" are not affected by the limited immunity for internet service providers often claimed by the latter from the federal Communications Decency Act. It fully applies. See *Perfect 10 v. CCBill,* 340 F.Supp.2d 1077, as reversed and affirmed at 481 F.3d 751 (9th Cir. 2007). **And, as discussed above, the law of the case under original District Judge Koh, established that the Decency Act did not immunize Facebook from the application of Civil Code § 3344.** (Order re MTD at 19, ER 447.)

That children lack capacity to consent to many types of contracts underlies much of our system to protect them. California law "shields minors from their lack of judgment and experience and confers upon them the right to avoid their contracts in order that they may be protected against their own improvidence and

39

the designs and machinations of other people, thus discouraging adults from contracting with them." *Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 137 (citing *Niemann v. Deverich,* 98 Cal.App.2d 787). As noted above, we have age minimums applicable to everything from voting (USCS Const. Amend. 26, § 1) to smoking (15 USCS § 4401), to liquor (23 USCS § 158), tattoos (Cal. Pen. Code § 653), and even sex (Cal. Pen. Code § 261.5). The inability of the adolescent brain to regulate emotional responses, resist peer influences, and calculate the harmful future consequences of present actions is the basis for the recent U.S. Supreme Court rulings abolishing the death penalty for minors and prohibiting the mandatory imposition of a sentence of life without parole, even for homicide offenses. *See Roper v. Simmons*, 543 U. S. 551, 560 (2005); *Graham v. Florida*, 560 U. S. 48 (2010) and *Miller v. Alabama/Johnson v. Hobbs*, __U.S.__, 132 S. Ct. 2455 (2012). "It is the policy of the law to protect a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant. Any loss occasioned by the disaffirmance of a minor's contract might have been avoided by declining to enter into the contract." *Niemann v.  Deverich* (1950) 98 C.App.2d 787, 793. It is unclear how federal court approval of the instant blanket waiver protects the privacy and property rights of children (who lack the capacity to so consent), or to the parental rights of Mom and Dad.

40

This problem is exacerbated for the 10 million plus current teen subscribers who have already gone past the "terms and conditions" check off. For them, consent is accomplished through a Facebook "notice" that its (now differently termed) "Rights and Responsibilities" provision has been altered. The actual changes are not in the notice. Continued use after that "notice" will purportedly effectuate blanket consent from them and their parents.

California Family Code § 6701 echoes common law prohibitions against enforcing contracts against minors, providing that certain types of contracts made by minors are void as a matter of law.[7] Family Code § 6701 provides explicit restrictions on a minor's authority to contract, by prohibiting a minor from doing any of the following:

(a) Give a delegation of power.
(b) Make a contract relating to real property or any interest therein.
(c) Make a contract relating to any personal property not in the immediate possession or control of the minor.

The proposed Settlement Agreement violates both subsections (a) and (c). Facebook claims that Family Code § 6701(a) is inapplicable to this case because "[n]either Facebook's current Terms nor the revisions contemplated by the Revised Settlement purport to delegate to Facebook a power of agency." (Defendant Facebook, Inc.'s Memorandum of Points and Authorities in Support of Plaintiffs'

---

[7] In addition, the Family Code provides that many other contracts made by a minor are voidable by disaffirmance (Family Code section 6710).

Motion for Final Approval of Class Action Settlement ("Defendant's Motion for Final Approval") at 77, ER 143.) But § 6701(a)'s categorical prohibition against a delegation of power is here violated *in extremis*. The Settlement Agreement purports to delegate to Facebook unfettered power to take information posted by a child, package it, and transmit it in any form and to potentially millions of recipients and for any commercial purpose, as Facebook determines. The existence of an agency relationship has the distinguishing features of "representative character and derivative authority" (*see e.g., Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 207). Here, Facebook claims that it has the power, delegated to it by a minor directly and through the minor's representation that a parent so consents, to take, use, and promote (represent) the minor's information and images to third parties *en masse*. Assuming for the moment that Facebook users (principals) really do retain "immediate possession and control" of their information and images once they are posted on Facebook (as Facebook itself contends (*see* Defendant's Motion for Final Approval at 77, ER 143)), this is a delegation of extraordinary power to Facebook, and a grant of power that is unwise given the cyber world in which the power is being wielded. The relationship has all of the features of a grant of agency power.[8]

_____

[8] As to Family Code § 6701(a), the facts of this case are distinguishable from *I.B. v. Facebook, Inc.* 905 F. Supp. 2d 989 (2012). There, the court properly declined to find an agency relationship between Facebook and minor Facebook users who

Under the terms of the Settlement Agreement, the lone check on such a self-serving delegation would come from affirmative parental objection—blindly and in advance. Parents are somehow to know that Sponsored Story use may occur unrelated to any particular seizure and republication.

Beyond § 6701(a), the terms of the Settlement Agreement also violate Family Code § 6701(c) in two respects.[9] First, by explicitly prohibiting a minor from making "a contract relating to any personal property not in the immediate possession or control of the minor," § 6701(c) prohibits a minor from, for example, contracting with respect to a future interest. *Sisco v. Cosgrove* (1996) 51 Cal. App. 4th 1302, 1307. However, the Settlement Agreement allows Facebook to infer

---

charged items to their parents' credit or debit cards possibly without the parent's knowledge or consent. As Facebook argued in *I.B.*, that case involved the users' "simple act of making a purchase," which did not amount to a delegation of power to Facebook. Appellant agrees the court there is properly unsympathetic to minor plaintiffs who received the benefit of a bargain they knowingly and affirmatively sought out. None of those elements are present in the instant case, where Facebook is attempting to presume a delegation of authority from its users to represent the users' information and images to third parties — and here, the only entity receiving any compensation or benefit is Facebook itself.

[9] As a preliminary matter relevant to both provisions, Appellants note that the content and information that a minor user uploads to Facebook constitute "personal property" in California. According to Facebook, users "own all of the content and information" they upload to Facebook (*see* Declaration of Ana Yang Muller in Support of Facebook, Inc.'s Motion to Dismiss Second Amended Class Action Complaint, at Exhibit A, ER 468-470). "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property." (Cal. Civ. Code § 654.) Every kind of property that is not real is personal. (Cal. Civ. Code, § 663.) The term "personal property" includes both tangible and intangible personal property (Cal. Code of Civ. Proc., § 680.290).

from a minor's creation of a Facebook account that the minor accepts Facebook's contractual terms (or as Facebook now calls them) the "Statement of Rights and Responsibilities" — and not just with regard to information and content in the immediate possession or control of the minor that day, but with regard to *all information and content that the youth comes into possession or control of in the future* which the minor uploads to Facebook.   Thus, a minor who creates a Facebook account today would be deemed by the Settlement Agreement to be consenting to allow Facebook's use of all images and content the minor uploads each day from now until the minor closes his/her Facebook account or reaches the age of majority, whichever comes first — inarguably including images and content that were not in the possession or control of the minor when the alleged contract was made.  Because the Settlement Agreement allows minors to enter into a contractual relationship with regard to personal property (photos, images, content, information) that may not yet exist — and that are not in the immediate possession or control of the minor — it violates Family Code § 6701(c).

Second, even if each use of a minor's Facebook account were  deemed to infer the minor's re-affirmation of the terms of Facebook's Statement of Rights and Responsibilities, the Settlement Agreement still sanctions a violation of Family Code § 6701(c).  Facebook argues that § 6701(c) is not applicable because minor users have "immediate possession or control" over the images and information

44

they upload to Facebook (Defendant's Motion for Final Approval at 77, ER 143).

However, the very act of posting content to Facebook involves the relinquishment

of the kind of ***exclusive possession or control*** of that content that California law

envisions with respect to personal property. "The ownership of a thing is the right

of one or more persons to possess and use it ***to the exclusion of others.***" (Cal. Civ.

Code § 654 (emphasis added).) Until a minor removes his/her content from

Facebook, he/she lacks the ability to possess and use it to the exclusion of others

— a fact evident by Facebook's ability to take and transform the minor user's

content into a different format (*e.g.,* Sponsored Stories) which it then publishes and

disseminates for its own commercial gain.[10] Judge Koh's decision on the Motion

to Dismiss in the instant case found that Facebook is more than an interactive

computer service but also meets the definition of a content provider by taking

Plaintiff's information and repackaging it to republish it. *See* Order re MTD at

17-19, ER 445-447. Because the Settlement Agreement allows minors to enter

---

[10] In *I.B. v. Facebook, Inc.* (2012*) supra*, plaintiffs there also argued that Family
Code § 6701(c) rendered the sales contracts void. But in that the minors were not
in the immediate possession or control of their parents' credit cards or bank
accounts when the purchases were made. Contrary to Facebook's theory here, the
court agreed that plaintiffs have alleged a plausible claim that the transactions at
issue are void contracts "relating to any personal property not in the immediate
possession or control of [a] minor" and denied Facebook's motion to dismiss the
claim for declaratory relief under section 6701(c). These facts are substantially *a
fortiori* to the issue of simple credit card use by a child to pay for something
legitimately received.

into a contractual relationship with regard to personal property that is not in their exclusive possession or control, it violates Family Code § 6701(c).

In a similar context to the one at issue here, the California Legislature set forth yet additional specific safeguards to protect a child's interest in his/her image. California Family Code §§ 6750 *et seq.* applies to the protection of their "likeness" (photos). These Family Code provisions relate to "contracts in art, entertainment, and professional sports"—*i.e.*, contracts pertaining to minors who are paid as entertainers or athletes. These statutory protections for children subject to such marketing use are comprehensive and detailed. Family Code § 6752 requires all sorts of safeguards, including explicit, individualized consent of a parent or guardian for each such contract, and even requires minimum and specified compensation for the child, as well as many other protections. The detailed provisions make clear that the contract must be controlled front to back by "at least one parent or legal guardian, as the case may be, entitled to the physical custody, care, and control of the minor at the time." (*See e.g.,* Calif. Family Code § 6752 (b)(2).) The Settlement Agreement stands in stark contrast – with *none* of these protections and more important, the denial of the underlying and generally applicable consent requirements for child contracts.

To be sure, most teen Facebook subscribers have never received compensation as actors or athletes and are not within the protection of § 6752,

but California hardly lacks examples of such children.  Nevertheless, the blanket

waiver sweeps them up as well, with no differentiation or exception.  (Defendant's

Motion for Final Approval at 78, ER 144.)

Perhaps the single most troubling argument in the instant case is

Facebook's defense **that none of the state statutory or constitutional provisions**

**can apply because of federal preemption, citing the federal Children's Online**

**Privacy Protection Act (COPPA)** (15 U.S.C.  §§ 6501–08).  (Defendant's Motion

for Final Approval at 22-25, ER 88-91.)  Facebook has provided no actual

authority for this position, which ignores basic rules of statutory interpretation.[11]

Despite the complete lack of authority provided by Facebook and underscoring the

---

[11] The lone case cited by Facebook in support of its position is a Los Angeles
Superior Court case, *David Cohen v. Facebook,* No. BC 44482 (L.A. Super. Ct).
In fact, the discussion of this case dominated early oral argument in the case, with
the District Court and counsel treating this superior court decision as if it were
a leading Supreme Court precedent.  In addition to citing a case that has no
precedential authority, Facebook has mischaracterized the sequence of events
in *Cohen.*  Implying a direct nexus between the court's ruling and its dismissal of
the case, Facebook states, "[a]pplying COPPA's express preemption clause, a
California court recently dismissed a class action premised on the same parental
consent requirement urged by Plaintiffs here."  (Defendant's Motion for Final
Approval at 23, ER 90.)  While the case was dismissed (*see,* Declaration of Robert
Fellmeth at ¶ 12 and the attached November 28, 2011 Minute Order, ER 236 and
ER 239-241),  the *Cohen* plaintiffs never moved for class certification and no class
had been certified (*see* Declaration of Robert Fellmeth at ¶ 13 and the attached
Plaintiffs' Request for Voluntary Dismissal Without Prejudice, ER 236 and 243-
247).  Further, the *Cohen* plaintiffs requested the dismissal without prejudice not as
a direct result of the superior court's rulings alone, but also in light of the pendency
of *E.K.D. v. Facebook* (Civil Case No. 11-461-GPM, U.S. District Court for the
Southern District of Illinois).  See the Declaration of Antony Stuart in Support of
Plaintiffs' Request for Voluntary Dismissal, ER 236 and 249-251).

deference the District Court gave to the Settlement Agreement, the District Court found that COPPA "could bar *any efforts by plaintiffs to use state law to impose a parental consent requirement* for minors over the age of 13." (Final Approval Order at 13, ER 17 (emphasis added).) And, indeed, that is apparently why he simply dismissed all contentions of state law violation by simply labeling them "unavailing" or "inapplicable" (see discussion above).

COPPA provides that "no state or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this title that is inconsistent with the treatment of those activities or actions under this section." (15 U.S.C.S. § 6502 (d).) The activity and actions "described in this title" deal, specifically, with the collecting of personal information from a child by an operator of a website or online service. (15 U.S.C.S. § 6502 (a).) For the purposes of this title, "[t]he term 'child' means an individual under the age of 13." (15 U.S.C. S. § 6501 (1).) ***COPPA does not apply to operators of websites or online services collecting of personal information from youth aged 13 and over*** — and thus is not applicable to the teen child subclass herein. In other words, by expressly limiting the term "child" to only include individuals under age 13 in COPPA, instead of using the common "under age 18" definition used in other federal statutes (*see e.g.,* 42 USCS § 1382c; 8 USCS § 1255; 42 USCS § 1779e; 18 USCS

§ 3509), it is fair to suppose that Congress specifically considered and rejected the option of having COPPA apply to youth ages 13-18. Thus, COPPA's preemption clause does not apply to teen children here, as what is omitted or not included in law was intended to be omitted or excluded. (*See e.g., Marx v. Gen. Revenue Corp.,* 133 S. Ct. 1166, 1175 (recognizing that the *expression unius est exclusion alterius* canon applies when it is "fair to suppose that Congress considered the unnamed possibility and meant to say no").)

What COPPA does do for children under age 13 is to create a high floor — prohibiting even the initial receipt of information by an Internet service provider such as Facebook without explicit parental permission, and with other strong restrictions. The fact that it sets a very high floor of privacy rights for those young children hardly constitutes federal preemption of state statutes *providing* a more liberal, lower floor with at least some protections for teens *not even within COPPA's obvious applicable age scope,* and who entirely make up the teen children subclass here at issue.[12]

---

[12] Although the FTC rule implementing COPPA emphasizes its limitation to those under 13 years of age, as discussed above, note 19 of the proposed FTC rule cited above includes an illuminating list of the citations relevant to teens not covered by COPPA, which are in fact of great concern to the agency – albeit beyond the statute's jurisdiction.

### B. It is Neither Fair, Reasonable, nor Adequate to Violate the Constitutional Fundamental Liberty Interest to Parent.

The "right to parent" is a federally recognized "fundamental liberty interest" under the Constitution, and one entitled to strict scrutiny in its limitation. For example, the termination of parental rights requires extraordinary due process safeguards, including even required counsel for parents threatened with the seizure of their children if such representation could make a difference in the outcome, and can only be ended by "clear and convincing evidence" of parental unfitness. See *Lassiter v. Department of Social Services* 452 U.S. 18 (1981); *Santosky v. Kramer* 455 U.S. 745 (1982). Parental authority to approve who may even see a child (even the child's own grandparents) was confirmed in the U.S. Supreme Court's holding in *Troxel v. Granville* 530 U.S. 57 (2000). The extensive caselaw on point would appear to be inconsistent with a federal court holding that a private commercial entity may cede unto itself this rather profound parental function, without the effective consent of the actual parent.

### C. The Settlement Violates the Explicit Privacy Guarantee of Article I, Section 1 of the California Constitution, Directly Applicable to Private Actors Such as Facebook.

The most recent leading case on California privacy notes: "[t]he phrase 'and privacy' was added to the [California] Constitution by a voter initiative adopted in 1972. (*Hill v. National Collegiate Athletic Ass'n* (1994) 7 Cal. 4th 1, 15) [the 'Privacy Initiative'].)" *Sheehan v. SF 49ers* (2009) 45 Cal. 4th 992, 997. The

50

*Sheehan* court adds that unlike most constitutional protections applying only to state action, "the privacy clause **applies to private entities**" (*id.* at 999, emphasis added). *Sheehan* and other cases on point apply a "strict scrutiny" type of review for private incursions in this state. Indeed, the *Sheehan* case again cites *Hill* for the proposition that one of the two core privacy interests protected is "precluding the dissemination or misuse of sensitive or confidential information ('informational privacy')" (*id.*). A wide dissemination of personal child postings to potentially millions seems rather central to its intended application.

The issue of the California constitutional privacy, as raised by Objector Westfield below (Letter dated January 27, 2013 from Danielle Westfield, ER 253), and the invasion of privacy claims as made by Objector Schacter below (Objections to Proposed Settlement and Notice of Intent to Appear filed May 2, 2013 at 9-12, ER 168-171) join the explicit California privacy statutory claims raised by instant Appellants as Objectors. None of these citations or arguments were part of any presentation or claim made by counsel for the subclass of children, which only included California Civil Code § 3344 and the Unfair Competition Law.

### D. The Settlement Authorizes a *Per Se* Antitrust Offense.

One of the many problems with the Facebook thesis of "consent" by a minor (and the parent) through continued use of Facebook is that "sponsored stories" is

not a "social networking" service market. It is part of a different "commercial

endorsement market." Facebook hardly advertises "sponsored stories" in its ads.

Continuation of Facebook does not provide consent to the tie-in of that separate

commercial endorsement market. Facebook is not simply changing a social

networking feature, it is tying social subscribers into the separate endorsement

advertising market. And beyond this flaw in arguing that "continued use" of social

networking means consent as to endorsements, is a larger unaddressed problem: It

is a per se antitrust tie –in offense, a violative status extant since *International Salt*

*v. United States*, 332 U.S. 392, 396 (1947).

The elements constituting a per se offense here involve the tying together of:

(1) two separate relevant product or service markets, (2) substantial market power

in the tying product or service, and (3) a not insubstantial volume of commerce in

the tied product. *See, e.g., Northern Pacific R. Co. v. U.S.,* (1958) 356 1, 11.

The policy rationale here is that "the essential characteristic of an invalid tying

arrangement lies in the seller's exploitation of its control over the tying product to

force the buyer into the purchase of a tied product that the buyer either did not

want at all, or might have preferred to purchase elsewhere on different terms."

*Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2 (1984). Many Facebook

subscribers, if given a knowing choice, might not participate in the commercial

endorsement market, especially if their benefit is zero.

The caselaw has softened slightly in its condemnation of tie-ins as *per se* offenses.  The recent Supreme Court case of *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 37 (2006), requires proof of sufficient market power to distort consumer decisions in the tied market.  And an affirmative defense has been recognized where the tied product must be tied in order to protect the trade name of the tying product (*e.g.*, requiring the use of Mercedes parts in its autos).  *See* discussion in *Fleury v. Richemont North America, Inc.* 2008 U.S. Dist. LEXIS 64521 (at 55-56).   Finally, courts have held that there must be "some injury to competition" for a tie in to be found.  It cannot simply be theoretical, but must have some distorting impact on the tied service market.   See *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012).

These exceptions do not apply to the instant practice.  The tying of Facebook's social networking service market has extraordinary market power.  Commercial endorsements are hardly needed to preserve the Facebook social networking tradename.  And there is obvious competitive disadvantage to anyone seeking commercial endorsements from consumers who may be known to other consumers.   Indeed, that distorting power is reflected in Facebook's policy to pay nothing to the endorser, while collecting hundreds of millions of dollars (an obviously "not insubstantial sum" in the tied market).

A review of Ninth Circuit tie-in cases confirms its application to these undisputed facts, *see e.g*., *Bhan v. NME Hosps. Inc.,* 929 F.2d 1404 (9th Cir. 1991); see also *County of Tuolumne v. Sonora Community Hospital*, 236 F.3d 1148 (9th Cir. 2001); *see also Blough v. Holland Realty, Inc*., 574 F.3d 1084 (9th Cir. 2009). A typical example is *Datagate, Inc. v. Hewlett Packard Company,* 60 F.3d 1421 (9th Cir. 1995), which deals with the tie in between two service markets (hardware service and software service).

A settlement cannot be confirmed as fair, reasonable, and adequate if it violates federal or applicable state law. *See Grunin v. Int'l House of Pancakes* 513 F.2d 114, 123-24. As discussed above, *Grunin et al.* hold that violations of *per se* offenses are not to be approved. *Grunin* itself was an antitrust case with just this issue. Since tie-ins are *per se* offenses, they are properly examined with care before rejection. If the blanket consent ties the social service market to a commercial endorsement market, the extraordinary market share of Facebook in the tying market and the "not insubstantial" volume of commerce in the tied service (more than 200 million) comprises an unavoidable *per se* tie-in, with none of the three bases for exception applying.

The violation here also extends to state antitrust law. As noted above, Facebook concedes that California law applies. Business and Professions Code § 16700 *et seq.* also prohibits tie ins as *per se* offenses. One leading case

is *People v. National Association of Realtors* (1984) 155 Cal.App.3d 578, finding

a *per se* offense where the subscribers to the multiple listing services of the

San Diego Board of Realtors (a private trade association) were tied into the trade

association membership that involved social, educational and political functions.

Interestingly, ruling on the Motion to Dismiss, Judge Koh found that "plaintiffs

have stated a claim for unfair conduct under the UCL." (Order re MTD at 34, ER

462.) And that claim did not even include the antitrust offense here implicated.[13]

## CONCLUSION

The cases of adolescent improvidence in posting photos and comments are of

special concern to the Appellants. Appellants believe that Facebook likely does

not intend many of the inevitable consequences of its site's abuses. But

embarrassment and youthful indiscretion on the one end of the spectrum, and

bullying and suicides on the other end, are not part of the formulae in calculating

commercial return on image and information dissemination. Leading privacy and

child protection national organizations have filed *amicus* briefs and address the

subjects of teen angst, bullying and consequences, which we respectfully ask be

considered as informing the statutory intent behind the statutes and constitutional

interpretations at issue. (*See* Brief of *Amici Curiae* Center for Digital Democracy et

---

[13] These concerns were brought specifically to the District Court's attention at oral argument regarding the Final Settlement Agreement. *See* Reporter's Transcript at 64-65, ER 48-49.

al., In Support of Schachter Objectors-Appellants and Reversal, filed February 20, 2014, and Brief of *Amicus Curiae* Electronic Privacy Information Center (EPIC) in Support of Appellants, filed February 20, 2014.)

Most of the arguments above were not made to the District Court by counsel for the subclass of children, and in fact some of these rights were affirmatively disavowed by him. Appellants understand the deference normally accorded class and other settlements. But given who the objectors/appellants represent and their motivations and record, this Honorable Court is asked not to have the federal courts of the United States approve and sanctify this blanket categorical advance waiver of child and parental consent for the capture of teen postings and their authorized republication into a wide and non-retractable universe.

Appellants ask that this Honorable court hold that COPPA does NOT preempt or void, for teens, California law or constitutional provisions (that Facebook publicly concedes otherwise do apply to its operations). Given the issues raised, the matter should be remanded back to the District Court for full reconsideration, at least of the provisions applicable to the subclass of children and their parents.

Preferably, this Honorable Court would reverse the approval and explain why it is properly rejected, as respectfully argued above. Ideally, that rejection would provide some guidance as to (a) factors commending settlement approval

deference, and (b) the rights of children and parents as to a prospective federally approved blanket license to expropriate the postings of minors in light of applicable law.

Dated: March 14, 2014          /s/*Robert C. Fellmeth*
                               Professor Robert C. Fellmeth
                               Center for Public Interest Law/
                               Children's Advocacy Institute
                               5998 Alcala Park
                               San Diego, CA 92110
                               (619) 260-4806 Telephone
                               (619) 260-4753 Facsimile
                               cpil@sandiego.edu

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief uses a proportional typeface and 14-point font, and contains 13,920 words.

## STATEMENT OF RELATED CASES

The following appeals are consolidated with this appeal:  Nos. 13-16819, 13-16918, 13-16919, 13-16936, 13-17028, 13-17097.

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Stephen Moore
Senior Appellate Paralegal
COUNSEL PRESS LLC